18-1011-cv
*Francis v. Fiacco, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2018

(Argued: June 27, 2019          Decided: November 12, 2019)

No. 18-1011-cv

_____

BYRAN FRANCIS,

*Plaintiff-Appellee,*

-v.-

KIMBERLY FIACCO, AKA Kimberly Davidson, RICHARD DE SIMONE, DIANE
HOLFORD, and KRISTINA LENNON,

*Defendants-Appellants.*[1]

_____

Before:       JACOBS, LIVINGSTON, and CARNEY, *Circuit Judges.*

Byran Francis brought this lawsuit pursuant to 42 U.S.C. § 1983 against four
officials of the New York State Department of Corrections and Community
Supervision ("DOCCS"): Kimberly Fiacco, Richard de Simone, Diane Holford, and
Kristina Lennon (collectively, the "State Defendants"). Francis alleged that the
State Defendants violated his rights under the Eighth and Fourteenth

_____

[1] The Clerk of Court is respectfully instructed to amend the caption as set forth
above.

1

Amendments by holding him in state custody for four months after the expiration of his federal sentence, where the state sentencing court had originally directed that Francis's state and federal sentences should run concurrently. The State Defendants justified their implementation of Francis's sentence with reference to New York statutory law that apparently rendered the state court's directive of concurrency invalid under the circumstances of Francis's state sentencing. The United States District Court for the Northern District of New York (D'Agostino, *J.*) denied the State Defendants' motion for summary judgment, holding that the State Defendants' conduct violated the Eighth and Fourteenth Amendments and rejecting their qualified immunity defense. We reach the merits of only one of Francis's constitutional claims, holding that pursuant to *Mathews v. Eldridge*, 424 U.S. 319 (1976), the State Defendants violated the Due Process Clause by implementing Francis's sentence in the manner they did without providing adequate notice to the state sentencing court and the attorneys present at Francis's state sentencing. Nevertheless, we further hold that the State Defendants were entitled to qualified immunity from all of Francis's constitutional claims under the circumstances of this case. Accordingly, the order of the district court is REVERSED and the case is REMANDED with instructions to grant the Defendants' motion for summary judgment on qualified immunity grounds.

FOR PLAINTIFF-APPELLEE: BRIAN M. QUINN, Tabner, Ryan & Keniry, LLP, Albany, NY, *for Byran Francis*.

FOR DEFENDANTS-APPELLANTS: LAURA ETLINGER, Assistant Solicitor General (Andrea Oser, Deputy Solicitor General, *on the brief*), *for* Barbara D. Underwood, Attorney General of the State of New York, Albany, NY, *for Kimberly Fiacco, Richard de Simone, Diane Holford, and Kristina Lennon*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This case concerns the liability of state prison officials attempting to implement a prisoner's state sentence in relation to a subsequently imposed

federal sentence on another charge. In 2006, Byran Francis pleaded guilty to two separate charges in two separate jurisdictions: a drug charge in New York state court and a gun possession charge in federal court. Francis's state sentencing occurred first. The state court sentenced Francis to a three-year maximum term of imprisonment and directed that his state and federal sentences run concurrently. Under New York law, however, state courts lack the authority to direct that a prisoner's state sentence run concurrently with a sentence from another jurisdiction unless that latter sentence has already been imposed. *See* N.Y. Penal Law § 70.30(2-a). Consistent with that statutory scheme, officials of New York State's Department of Corrections and Community Supervision ("DOCCS") did not implement the state court's directive of concurrency, instead taking Francis into state custody upon completion of his ten-year federal sentence so that he could begin serving his state sentence. Francis then served about four months of his state sentence in DOCCS custody, before the state court's adjustment of the sentence ultimately brought about his release.

Upon his release from state custody, Francis brought suit pursuant to 42 U.S.C. § 1983 against four DOCCS officials: Kimberly Fiacco, Richard de Simone, Diane Holford, and Kristina Lennon (collectively, the "State Defendants").

3

Francis alleged that the State Defendants had violated his rights under the Eighth and Fourteenth Amendments by holding him in state custody rather than releasing him upon expiration of his federal sentence. The United States District Court for the Northern District of New York (D'Agostino, *J.*) denied the State Defendants' motion for summary judgment. The district court agreed with Francis that the State Defendants' conduct had violated the Eighth and Fourteenth Amendments and rejected the State Defendants' claim of qualified immunity. We reach the merits of only one of Francis's constitutional claims, holding that pursuant to *Mathews v. Eldridge*, 424 U.S. 319 (1976), the State Defendants violated the Due Process Clause by implementing Francis's sentence in the manner they did without providing adequate notice to the state sentencing court and the attorneys present at Francis's state sentencing. Nevertheless, we conclude that the State Defendants are entitled to qualified immunity from all of Francis's constitutional claims under the circumstances of this case. We therefore REVERSE the order of the district court and REMAND the case with instructions to grant the State Defendants' motion for summary judgment on qualified immunity grounds.

## BACKGROUND[2]

### I.

The story of this appeal begins with two guilty pleas and their resulting sentences. Francis first faced sentencing in state court. Francis was also subject to federal charges at that time but had not yet undergone sentencing by a federal court. Before the Supreme Court of the State of New York, County of Erie, Francis pleaded guilty to attempted criminal possession of marihuana in the second degree, a class D felony in violation of N.Y. Penal Law § 221.25. On September 8, 2006, the Honorable Penny M. Wolfgang sentenced Francis to a minimum term of imprisonment of one and a half years and a maximum term of three years, indicating that the term should run concurrently with Francis's "federal sentence sched[uled] to be imposed soon." J.A. 75.

Francis was in custody both before and after his state sentencing, but the record reflects some confusion over which governmental authority had custody of him at that time. On Francis's commitment order, the state court checked a box indicating that Francis was "presently in the custody of [DOCCS]" and directing

---

[2] The factual background presented here is derived from undisputed facts contained within the parties' submissions at summary judgment.

that he "remain in the custody of [DOCCS]." *Id.* However, DOCCS records state that Francis was only first received by DOCCS authorities on April 15, 2013, after completion of his federal sentence. Furthermore, Francis stated in his deposition that he was being held at a *local* jail, the Erie County Holding Center, from the time of his arrest until the time "they took my bail" in June 2006, as well as at the time of his state court sentencing and "until two weeks after I got sentenced." J.A. 111.[3]

In any event, soon after his sentencing before the state court, Francis was transferred to federal custody for his second round of sentencing. In the United States District Court for the Western District of New York, Francis pleaded guilty to the federal crime of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). On November 27, 2006, Francis was sentenced by the Honorable William M. Skretny to a term of imprisonment of 120 months and a term of supervised release of five years.

The district court did *not* direct that Francis's federal sentence run concurrently with the previously imposed state sentence, and thus his federal

---

[3] Court records confirm that Francis subsequently received "jail time credit"—a credit against his state sentence for time previously served in local custody—from April 27 to June 27, 2006, and from September 5 until September 14, 2006, confirming his deposition testimony that he was held in local custody at (roughly) those times.

6

sentence was deemed to run consecutively to the state sentence as a matter of federal law. *See* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently."). Accordingly, the United States Bureau of Prisons ("BOP") did not direct that Francis serve his federal sentence in state custody, as the BOP is statutorily authorized to do when implementing a federal sentencing court's directive of concurrency. *See* 18 U.S.C. § 3621(b). Francis was therefore remanded to the custody of the United States Marshal to begin serving his federal sentence in federal prison.

## II.

As Francis began serving his federal sentence, the State Defendants faced a predicament in determining how to implement his state sentence. The state sentencing court had directed that Francis's state sentence should run concurrently with his federal sentence. But at the time of Francis's state court sentencing, that federal sentence had not yet materialized.

New York law does not authorize its judges to issue such forward-looking directives of concurrency. To the contrary, New York sentencing courts may only direct that a defendant's state sentence run concurrently with a sentence from

7

another jurisdiction that has already been imposed. Specifically, under New York Penal Law § 70.30(2-a):

> Where a person who is subject to an undischarged term of imprisonment imposed at a previous time by a court of another jurisdiction is sentenced to an additional term or terms of imprisonment by a court of this state, to run concurrently with such undischarged term, such additional term or terms shall be deemed to commence when the said person is returned to the custody of the appropriate official of such other jurisdiction where the undischarged term of imprisonment is being served.

In other words, time served by Francis on his federal sentence while in federal custody could count against his state sentence too, provided that (1) the state sentencing court had directed that the state sentence would "run concurrently with" his federal sentence; (2) the federal sentence was "undischarged," or not yet completed, at the time the state sentence was imposed; and (3) the federal sentence had been "imposed at a previous time" to the state sentence. Absent a state sentence satisfying these three requirements, New York law contains a general rule that the prisoner's sentence "commences when the prisoner is received in an institution under the jurisdiction of the state department of corrections and community supervision." N.Y. Penal Law § 70.30(1).[4]

---

[4] In the typical circumstance where a prisoner is held in local custody prior to trial or sentencing on state charges or a state conviction, the prisoner's state sentence does not commence until the prisoner is received into a state facility operated by DOCCS, but the

8

The sentence that the state court imposed on Francis failed the third requirement described above. At the time the state court sentenced Francis, his federal sentence had *not* been previously imposed; indeed, the state court's decree specifically instructed that Francis's state sentence run concurrently with the "federal sentence *sched[uled] to be imposed soon*." J.A. 75 (emphasis added). Consistent with the statutory scheme described above, New York courts have recognized that sentencing courts lack authority under New York law to direct that a prisoner's state sentence run concurrently with a not-yet-imposed sentence from another jurisdiction. *See Matter of Oquendo v. Quinones*, 291 A.D.2d 593, 594 (3d Dep't 2002) ("[T]he law did not permit the sentence imposed . . . to run concurrently with a subsequently imposed federal sentence."); *People v. Brown*, 193 A.D.2d 750, 750 (2d Dep't 1993) (holding that sentencing court "lacked the authority" to "promise that the sentence it imposed upon the defendant would run concurrently with a sentence which had yet to be imposed upon the defendant by a Federal court"); *see also People v. Alexander*, 213 A.D.2d 227, 228 (1st Dep't 1995) (recognizing that sentencing court "was powerless to provide that [defendant's]

---

prisoner also receives jail time credit against his state sentence for the time served in local custody.

9

sentence be concurrent to some future sentence which might eventually be imposed").

Hence the predicament: the state court had directed that Francis's state sentence run concurrently with his federal sentence, but New York law did not authorize that directive under the circumstances of Francis's case. Instead, New York law instructed that Francis's state sentence not begin to run until after Francis was received by New York State prison authorities. And the State Defendants had (at a minimum) reasonable grounds to conclude that Francis had not yet been received by those authorities.[5]

The State Defendants thus found themselves between the rock of the state court's sentencing order and the hard place of the New York statutory scheme denying the state court the authority to sentence Francis in the manner it

---

[5] *See supra* at 6 & n.3. In addition to the evidence described above suggesting that Francis was held in local (rather than state) custody prior to his state sentencing, the customary practice of New York authorities suggests the same. Criminal defendants in New York are typically held at local jails from the time of their arrest through trial and sentencing (absent release on bail or recognizance), and until their transfer to state or federal prison authorities to begin serving their sentences. *See* N.Y. Correct. Law § 500-a(1)(b) ("Each county jail shall be used . . . [f]or the detention of persons charged with crime[] and committed for trial"); N.Y. Crim. Proc. Law § 510.10 (providing that when a defendant "initially comes under the control of a court, such court must . . . either release him on his own recognizance, fix bail or commit him to the custody of the sheriff"); N.Y. Correct. Law § 500-c(1) ("[T]he sheriff of each county shall have custody of the county jail of such county.").

purported to do. The State Defendants therefore commenced some brief deliberations as they sought to determine the proper course of action. Fiacco, whose position gave her the principal responsibility for implementing Francis's sentence, stated in her declaration that while she had "no independent recollection of receiving or processing Sentence and Commitment papers for [Francis]," J.A. 42, "DOCCS's records appear to indicate that [she] sought direction from and confirmed with the Office of Sentencing Review that [Francis's] sentence had to run consecutive to his federal sentence by operation of [New York's] Penal Law," J.A. 43–44. Holford's declaration corroborates Fiacco's account, noting the presence in DOCCS records of "a handwritten note from [Fiacco] . . . apparently showing that [Fiacco] and [Holford] discussed [Francis's] sentence on or about May 4, 2007, . . . [and that Holford] advised [Fiacco] that [Francis's] NYS sentence had to run consecutive to his federal sentence unless the federal sentence was imposed prior to the NYS sentence." J.A. 56; *see also* J.A. 62. Finally, all four of the State Defendants noted their shared understanding that, pursuant to New York statutes, "where an individual's NYS sentence is imposed before the federal sentence is imposed, the individual's NYS sentence could only commence upon

11

his transfer to DOCCS after his release from federal custody." J.A. 43 (Fiacco); *see also* J.A. 53 (Lennon) (same); J.A. 56 (Holford) (same); J.A. 71 (de Simone) (same).

Given that shared understanding of the law, the State Defendants elected to implement Francis's sentence as the New York statutory scheme ostensibly required rather than attempt to effectuate the state court's intended result that Francis's two sentences run concurrently. Accordingly, on May 4, 2007, Fiacco composed a letter to the federal prison where Francis was then serving his federal sentence, enclosing a "certified copy of the consecutive New York State commitment of [Francis]" and asking the federal authorities to "lodge [Francis's commitment papers] as a detainer" against his release. J.A. 49. [6] Fiacco's declaration explains that as Coordinator of Inmate Movement, she was typically responsible for lodging such detainers on DOCCS's behalf. Her declaration also notes that such detainers were intended to ensure that "upon [his or her] release . . . the individual would be delivered to the custody of DOCCS to serve the NYS sentence which would commence upon his/her arrival to DOCCS's custody." J.A. 42. Finally, Fiacco's May 2007 letter to federal authorities also requested that

---

[6] "A detainer is a request 'to an imprisoning jurisdiction to detain a person upon his release so that another jurisdiction may prosecute or incarcerate him.'" *Weeks v. Quinlan*, 838 F.2d 41, 42 (2d Cir. 1988) (quoting *Pitts v. North Carolina*, 395 F.2d 182, 187 (4th Cir. 1968)).

the authorities notify the Erie County Sheriff at least thirty days prior to Francis's release in order to coordinate his return to New York.

### III.

Later that month, Francis learned from an employee of the federal prison where he was being held that DOCCS had filed the consecutive detainer against his release. Francis initially wrote to Fiacco, asking her to remove the detainer, but received no response. Francis's sentence then proceeded apace until two years later, when he decided to raise the issue with the state sentencing court directly. On May 31, 2009, Francis wrote to the state court, informing it that "Ms. Kimberly Fiacco has dropped a Detainer [sic] on me" and asking it to "look into this matter and correct this error for me in order to afford me the proper relief." J.A. 829. The state court's principal attorney responded on July 9, informing Francis that "[t]he court is not able to assist you presently in the absence of a formal motion or petition seeking specific relief,"[7] and that "upon [Francis's] release from

---

[7] As with the state court's initial sentencing of Francis, this letter apparently reflected an erroneous understanding of New York law, which in fact vests sentencing courts with the "inherent power to correct an illegal sentence" *sua sponte*. *People v. Williams*, 87 N.Y.2d 1014, 1015 (1996). No formal motion or petition from Francis was required.

the federal institution," he could "challenge [his] detention in the appropriate court." J.A. 830.

Thus rebuffed, Francis returned to the State Defendants to seek their assistance once again. On June 22, 2010, Francis composed a second letter to Fiacco, asking her to "review this matter . . . and have these people lift the detainer for me." J.A. 832. Francis enclosed his sentencing transcript along with his prior correspondence with the sentencing court. On July 1, on behalf of DOCCS in her capacity as Inmate Records Coordinator, Lennon responded to Francis's entreaty by sending him a letter reiterating the department's policy to run sentences consecutively under the circumstances present in cases like his. Lennon's letter stated, in relevant part:

> The Penal Law does not allow a sentence to run concurrently with a term of imprisonment that has not yet been imposed. Your state sentence will not commence until you are received by [DOCCS]; please see Penal Law § 70.30(1).

J.A. 833. Lennon subsequently verified to federal authorities, in September 2011, that the detainer lodged against Francis was consecutive rather than concurrent.

Following his receipt of Lennon's letter, Francis reengaged the state court. On August 16, 2012, Francis moved to set aside his state sentence under New York Criminal Procedure Law § 440.20(1), which allows a sentencing court to "set aside

14

[a] sentence upon the ground that it was unauthorized, illegally imposed or otherwise invalid as a matter of law." On January 9, 2013, the state court denied his motion, reasoning that Francis had failed to allege that the sentence was illegal or unauthorized by law. The state court declared that "the relief the defendant is seeking is not available pursuant to CPL § 440.20" and that "[h]is remedy is to seek relief against DOCCS pursuant to Article 70 or Article 78 of the Civil Practice Law and Rules if he is returned to the state on the detainer and is not immediately released." J.A. 210–11. A subsequent letter from the state court's principal attorney in May 2013 similarly informed Francis that he might "wish to commence an action pursuant to Article 70 or Article 78 of [New York's] Civil Practice Law and Rules challenging [his] detention." J.A. 838. Francis sent two additional letters to Fiacco during this period, one of which noted that he had considered the option of an Article 78 action but "wish[ed] not to pursue that method of resolution" and that he was still "seeking to have [the detainer] quashed in the . . . interest of justice." J.A. 835. The record contains no response, from Fiacco or any other DOCCS official, to either of these letters.

Meanwhile, Francis had become eligible in September 2012 for release from federal prison to a residential reentry center, or halfway house. As Francis

15

explained in his declaration, halfway houses "provide much greater liberty than prisons," and his release to a halfway house "would have provided [him] with reentry preparation, including job training and drug treatment," as well as "a place to stay upon [his] release" from custody. J.A. 813. The BOP declined to recommend a halfway house placement for Francis, however, due to the presence of the detainer filed by DOCCS and Francis's impending obligation to serve his state sentence with state authorities. Francis repeatedly noted this consequence of the detainer when corresponding with the State Defendants. *See* J.A. 832 ("[T]he [d]etainer that you lodged against me[] is playing a major roll[] [sic] for me not getting my half-way house date."); J.A. 835 ("[M]y acceptance into an approved institutional program is 'on hold' because of this detainer.").

On March 28, 2013, Francis was released from federal custody into the custody of the Erie County Sheriff's Department. Approximately two weeks later, Francis was received at a DOCCS-managed facility; DOCCS records list April 15, 2013 as the date of Francis's initial receipt into DOCCS custody. Upon Francis's arrival, DOCCS calculated his maximum expiration date as November 26, 2015 and his conditional release date as November 26, 2014, basing those dates on the term of Francis's state sentence, the date he was received by DOCCS, the

16

jail time credit he had received from time previously served in local custody, and possible good time credit that he might later receive.

Upon his release from federal custody, Francis promptly sought resentencing from the state court—this time with the assistance of counsel. On July 18, 2013, the state court resentenced Francis for the crime of attempted criminal possession of marihuana in the second degree. The court acknowledged that its original directive of concurrency was not authorized by law, explaining that "by operation of law, [Francis] did not receive the credit the Court intended." J.A. 89. The state court then reimposed its original sentence: a minimum term of imprisonment of one and a half years, with a maximum term of imprisonment of three years, such term to run concurrently with Francis's federal sentence on the gun possession charge. This time, though, the state court imposed the sentence *nunc pro tunc* to November 29, 2006, a date by which Francis's federal sentence had already been imposed.[8] Because the effective date of Francis's federal sentence now preceded the effective date of his state sentence, the state court's order now directed the state sentence to run concurrently with another sentence "imposed at

---

[8] As de Simone explained, "[a] *nunc pro tunc* order is effectuated by commencing the sentence retroactively as of the date specified by the Court." J.A. 73 (italics added).

17

a previous time by a court of another jurisdiction."   N.Y. Penal Law § 70.30(2-a). This allowed DOCCS officials to run those sentences concurrently without running afoul of New York law.   DOCCS immediately recalculated Francis's maximum expiration date as July 29, 2009—a date that had expired almost four years prior.   Accordingly, on July 23, 2013, after a brief period of administrative processing, Francis left DOCCS custody and reentered civilian life.

**IV.**

On January 13, 2014, Francis brought suit under 42 U.S.C. § 1983 in the United States District Court for the Southern District of New York, naming as defendants the State of New York, DOCCS, and ten "John Doe" employees of DOCCS, individually and in their official capacities.   Francis's complaint alleged that as a result of these defendants' actions his "liberty was restricted for an extended period of time . . . without justification and in violation of his constitutionally protected rights."   ECF No. 1 at 5 (Dist. Ct.).   The complaint asserted claims under the Fourth, Eighth, and Fourteenth Amendments, as well as several pendent state law claims.   Francis sought compensatory and punitive damages, along with attorneys' fees pursuant to 42 U.S.C. § 1988.

18

After the filing of an amended complaint and the transfer of the lawsuit to the United States District Court for the Northern District of New York, Fiacco moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). On June 20, 2016, the district court (D'Agostino, *J.*) granted Fiacco's motion to dismiss with respect to Francis's state law claims as well as his claims against her in her official capacity. But the court denied Fiacco's motion with respect to Francis's constitutional claims against her in her individual capacity, finding that Francis's complaint stated plausible claims for relief under the Fourth, Eighth, and Fourteenth Amendments. The court also concluded that it could not decide the issue of Fiacco's qualified immunity without further development of the record, postponing its ruling on that issue to a later stage of the litigation.

On January 31, 2017, Francis filed his Second Amended Complaint before the district court. The Second Amended Complaint named the four State Defendants—Fiacco, Lennon, de Simone, and Holford—now present before us on appeal. The complaint alleged, *inter alia*, that (1) Fiacco had issued the detainer wrongly certifying his detention as consecutive rather than concurrent; (2) Lennon had refused to remove that detainer upon his request; and (3) de Simone and Holford had supervised Fiacco and Lennon and developed the policies that

19

resulted in his allegedly unlawful detention. The State Defendants answered, asserting qualified immunity as a defense and contending that the complaint failed to state a cause of action. The parties then conducted discovery, producing declarations and deposition testimony from Francis and each of the four State Defendants, as well as numerous items of documentary evidence. The State Defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Francis opposed.

On March 16, 2018, the district court granted the State Defendants' motion in part and denied it in part. The court granted the motion with respect to Francis's Fourth Amendment claim, reasoning that Francis's allegations of false imprisonment pertained to the lawfulness of his post-conviction detention and therefore fell outside the scope of the Fourth Amendment. But the court denied the motion with respect to Francis's other claims. Regarding the Fourteenth Amendment claim, the district court first noted that Francis had a "protected liberty interest in being released upon the expiration of his maximum term of imprisonment." S.A. 13. The court then applied the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), to "determine whether the procedures attendant upon th[e] deprivation [of that interest] were

20

constitutionally sufficient." S.A. 13. The district court identified several additional procedural protections that the State Defendants should have provided. Among other things, the court noted that DOCCS has sometimes "sought clarification from a sentencing judge after being alerted . . . that [a prisoner's] sentence was intended to run concurrently with a prior undischarged term of imprisonment," S.A. 17, and questioned why the "irregularity [in Francis's sentence] was not immediately brought to the state court's attention" in this case, S.A. 18. With regard to the Eighth Amendment, the district court concluded that Francis's allegedly "unlawful[] incarcerat[ion] from September 28, 2012 until July 19, 2013" was sufficiently objectively serious to implicate the Amendment's Cruel and Unusual Punishments Clause. S.A. 21. The court further held that Francis's allegations described "officials who knew of a substantial risk that [Francis] would be incarcerated beyond his sentence expiration yet failed to act under circumstances exuding a deliberate indifference to [Francis's] plight." S.A. 27.

The district court largely rejected the State Defendants' qualified immunity defense, holding that *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936), and *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006), had clearly established the principle that "a criminal defendant had the right not to be imprisoned for a significant

period of time after he or she should have been released pursuant to the terms of [his or her] sentence." S.A. 34.[9] The district court reasoned that "[u]nder *Earley* and its progeny, [the State Defendants'] only permissible course was to release [Francis] or bring the issue to the attention of the district attorney, [Francis's] criminal counsel, and/or the state court." S.A. 35. The court did not undertake a separate qualified immunity analysis with respect to Francis's Eighth Amendment claim. Instead, it simply reiterated the conclusion that "Defendants were required to abide by the judgment of the [state sentencing] court because, as discussed, it is well settled that a jailor's authority to confine a prisoner begins and ends with the sentence pronounced by the judge." S.A. 36.

The State Defendants timely appealed the district court's decision.

## DISCUSSION

The State Defendants appeal from the district court's decision denying their motion for summary judgment and rejecting their claim to qualified immunity.

---

[9] The district court held that the State Defendants *were* entitled to qualified immunity for conduct that took place "in late 2006 through when the detainer was lodged in May of 2007," S.A. 33, citing "judicial confusion surrounding" the constitutional principle contained in *Earley* in the immediate aftermath of that case, S.A. 34. But the court held that the *Earley* principle had become clearly established "[b]y 2009, and absolutely no later than 2010," preventing the State Defendants from claiming qualified immunity "for their later conduct." S.A. 34.

22

This Court has jurisdiction to review an interlocutory order denying qualified immunity so long as defendants pursue the appeal "on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017) (internal quotation marks and citation omitted). Taking the plaintiff's version of the facts as true, this Court will then "review *de novo* a decision by a district court to deny summary judgment on the basis that a public official is not entitled to qualified immunity." *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014).

## I.

Because Francis has sued the State Defendants under 42 U.S.C. § 1983 for actions taken in the course of their official duties, his lawsuit must overcome the qualified immunity that shields executive officials from such liability. The doctrine of qualified immunity protects "government officials performing discretionary functions" from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of the doctrine is to avoid "the expenses of litigation, the

diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.* at 814; *see also Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, *J.*) ("[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.").

The Supreme Court has articulated, and this Court has adopted, a two-step analysis to determine whether qualified immunity bars a plaintiff's claim. Pursuant to that analysis, "[q]ualified immunity shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

The history of this two-step test reveals an ambiguity about how courts should apply it. The Supreme Court at one time required lower courts to undertake *both* steps of the analysis in *every* qualified immunity case, reasoning that the elaboration of constitutional doctrine might suffer if lower courts began "simply to skip ahead to the question whether the law clearly established that the

24

officer's conduct was unlawful in the circumstances of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). But *Saucier*'s "rigid order of battle" quickly encountered widespread criticism. *E.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 201–02 (2004) (Breyer, *J.*, joined by Scalia and Ginsburg, *JJ.*, concurring) (explaining that *Saucier* "requires courts unnecessarily to decide difficult constitutional questions when there is available an easier basis for the decision (*e.g.*, qualified immunity) that will satisfactorily resolve the case before the court"); Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1275 (2006) (calling *Saucier*'s two-step protocol a "puzzling misadventure in constitutional dictum"). Accordingly, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Court discarded *Saucier*'s mandate and held that lower courts should "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Since *Pearson*, lower courts have had the option to proceed directly to step two of the analysis and, if they find that qualified immunity applies, avoid the "[u]nnecessary litigation of constitutional issues" at step one. *Id.* at 237.

This case implicates the "sound discretion" that *Pearson* authorized. Because we ultimately resolve this appeal in favor of the State Defendants on qualified immunity grounds, we must also decide whether to reach the merits of Francis's constitutional claims along the way. We recognize compelling arguments against doing so. As the Supreme Court noted in *Pearson*, addressing constitutional arguments where qualified immunity applies "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Pearson*, 555 U.S. at 236–37. Standard principles of constitutional avoidance also weigh against the practice. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). Moreover, we acknowledge the Court's latest pronouncement on this issue: that "courts should think hard, and then think hard again, before turning small cases into large ones." *Camreta v. Greene*, 563 U.S. 692, 707 (2011); *see also id*. at 714 (Scalia, *J.*, concurring) (suggesting a willingness to "end the extraordinary practice of ruling upon constitutional questions unnecessarily when the defendant possesses qualified immunity"); *id*. at 727 (Kennedy, *J.*, dissenting) (same).

26

Nevertheless, there remains a role for courts to rule on constitutional questions even in cases where qualified immunity ultimately determines the result. As the Court explained in *Camreta*, such rulings "have a significant future effect on the conduct of public officials . . . and the policies of the government units to which they belong . . . by establishing controlling law and preventing invocations of immunity in later cases." *Id.* at 704–05 (majority opinion). For instance, *Camreta* invoked the hypothetical scenario of a court repeatedly rejecting a novel constitutional claim on qualified immunity grounds, adhering to traditional principles of constitutional avoidance but potentially licensing a government official's unconstitutional conduct in perpetuity. Courts taking that approach "fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements." *Id.* at 706. And an exclusive focus on qualified immunity in such contexts "may frustrate 'the development of constitutional precedent' and the promotion of law-abiding behavior." *Id.* (quoting *Pearson*, 555 U.S. at 237).

Under the circumstances of this case, we think the arguments weigh in favor of considering the merits of one of Francis's constitutional claims, notwithstanding the ultimate qualified immunity bar. For the reasons explained below, while the

law was not clearly established on this point, we conclude that the State Defendants failed to provide Francis with procedural protections that the Due Process Clause required. Were we to proceed directly to the qualified immunity question, and confine our entire analysis to that subject, the State Defendants could continue to withhold those procedural protections—and thus continue to violate the Constitution—*ad infinitum*. What's more, the State Defendants have represented that in the absence of a constitutional holding, they will do exactly that. *See* Oral Arg. Recording at 16:28 (Jacobs, *J.*: "Unless we rule against you, this . . . arrangement is going to continue?"); *id.* at 16:35 (Counsel to State Defendants: "Yes.").[10] Therefore, having thought hard and then thought hard again, we now exercise our *Pearson*-conferred discretion in proceeding to resolve one of Francis's constitutional claims, before ultimately concluding that the State Defendants are entitled to qualified immunity from all of them.

## II.

Francis claims that the State Defendants violated his rights under the Due Process Clause of the Fourteenth Amendment. That provision prohibits the

---

[10] Given our resolution of Francis's due process claim on the merits, we need not similarly address his Eighth Amendment claim at this time.

states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Federal courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted); *see also Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir. 1996). Accordingly, in considering the merits of Francis's procedural due process claim, we take the two steps of the inquiry in turn.

### A.

We must first identify the specific liberty interest for which Francis seeks protection. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). The liberty interest at stake in this case falls into the former category. At the most basic level, Francis's "liberty interest is that in avoiding future incarceration." *United States v. Vizcaino*, 870 F.2d 52, 56 (2d Cir. 1989). The general liberty interest in freedom from detention is perhaps the most

29

fundamental interest that the Due Process Clause protects. *See, e.g., Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Parham v. J.R.*, 442 U.S. 584, 600 (1979) (recognizing a "substantial liberty interest in not being confined unnecessarily").

We recognize that, "given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty" such that "the State may confine him and subject him to the rules of its prison system." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). But conviction at trial does not extinguish a prisoner's liberty interest in freedom from detention altogether. For one thing, "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause." *Gardner v. Florida*, 430 U.S. 349, 358 (1977); *see also id.* ("The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process."). We have also recognized that "an inmate has a liberty interest in being released upon the expiration of his maximum term of imprisonment." *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647, 653 (2d Cir. 1993). Thus, while a valid conviction subjects a defendant to a constitutional

deprivation of his liberty, the determination of his sentence, and the state's compliance therewith, remain subject to due process protections.

It follows naturally that a prisoner's liberty interest in freedom from detention implicates the Due Process Clause not only when a jury convicts him or when a court initially sentences him, but also when prison officials interpret and implement the sentence that the trial court has imposed. In the typical case, implementation of the prisoner's sentence follows straightforwardly from the sentencing court's commitment order. But Francis's was not the typical case. The sentencing court issued a directive that Francis's state sentence should run concurrently with a future sentence from a different jurisdiction. The State Defendants, however, concluded that New York law did not authorize the sentencing court to issue that directive and that they therefore could not follow it. As a result, Francis's sentence as implemented by the State Defendants diverged from the sentence originally pronounced by the sentencing court.

Regardless of whether the State Defendants' course of conduct was legally justified (or perhaps even legally required), their decision to implement Francis's sentence in a manner that diverged from the sentence pronounced by the sentencing court implicated a liberty interest of the highest order. Therefore,

31

when the State Defendants declined to implement the sentencing court's directive of concurrency, filed the consecutive detainer with the BOP, and retained custody of Francis upon expiration of his federal sentence, the Due Process Clause required them to provide certain procedural protections to safeguard Francis's liberty interest in avoiding future incarceration. We turn now to consider what exactly the Due Process Clause required under those circumstances.

**B.**

Having identified the liberty interest at stake, we now consider whether the procedures that the State Defendants followed in implementing Francis's sentence sufficiently protected that interest. In determining "what process is due," we recognize that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972). To assess whether the government's procedures meet that flexible standard under a given set of circumstances, this Court applies the three-factor analysis from *Mathews v. Eldridge*, 424 U.S. 319 (1976), considering (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's

32

interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

We first consider "the private interest . . . affected by the official action." *Id.* The private interest at stake in this case was Francis's interest in his timely release from prison. As the Supreme Court has stated, "the interest in being free from physical detention by one's own government" is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). The importance of the private interest at stake here requires no further elaboration. Francis's interest in freedom from detention was an interest of the highest order.

Second, we consider "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Assessing first "the risk of an erroneous deprivation" of Francis's liberty under "the procedures used" here, *id.*, we conclude that the risk was unacceptably high. As this case demonstrates, New York has enacted a complex statutory scheme governing the imposition and implementation of criminal sentences. The sentence-calculation procedures on display here involved a coterie of non-lawyers interpreting that statutory scheme and then privileging their understanding of the law above the

sentence pronounced by the sentencing court. Under these circumstances, the risk that Francis would be detained beyond his maximum term of imprisonment was unacceptably high. We cannot countenance a system whereby prison officials implement a sentence in a manner that deviates from the sentence pronounced by the sentencing court on the basis of unchecked conclusions about the legality of that pronouncement.

The State Defendants argue that their procedures sufficiently safeguarded Francis's liberty because "[Francis] was notified that defendants could not implement the sentencing court's directive of concurrency" and "[Francis] acted on that notice . . . by contacting the sentencing court." Defs.-Apps. Br. 55. But as the facts recounted above make clear, the mere provision of notice to a prisoner is grossly inadequate to safeguard his liberty under these circumstances. Francis *did* contact the sentencing court, but instead of carefully reviewing Francis's circumstances and complaint, the state court responded to his *pro se* submissions by erecting a Kafkaesque sequence of roadblocks and prerequisites to consideration of his claim. First, the state court inaccurately informed Francis that it could not give him any relief absent a formal motion; second, when Francis actually made that motion, the state court rejected it on technical grounds; and

34

finally, the state court referred him to a state Article 78 proceeding that Francis could not have initiated until *after* he had sustained the deprivation of liberty he was seeking to prevent. Contrary to the State Defendants' argument, merely notifying a prisoner that his liberty might be in jeopardy and then placing upon him the burden of navigating the legal system, from his prison cell and without counsel, does not satisfy the requirements of the Due Process Clause.

The "probable value" of "additional or substitute procedural safeguards," *Mathews*, 424 U.S. at 335, meanwhile, is quite high. The district court noted that the State Defendants should have "[brought] any sentencing irregularities to the attention of the sentencing court so that the defendant [could] be resentenced to comply with the law." S.A. 18. We add that the State Defendants should also have notified the attorneys who appeared on behalf of each of the parties at Francis's sentencing. Finally, they should have done so promptly upon discovering the irregularity in Francis's state sentence (whether before or after the filing of the detainer).

Prompt notice to the sentencing court and both parties' attorneys of the perceived error in the prisoner's original sentence as initially pronounced will in many circumstances abate the risk of an erroneous deprivation of a prisoner's

35

liberty altogether.   Francis's is a case in point: upon his transfer to state custody, Francis sought resentencing with the aid of counsel, and the sentencing court immediately granted it, acknowledging that "by operation of law, [Francis] did not receive the credit the Court intended."   J.A. 89.   The ease of obtaining that result suggests that previous formal contact with the sentencing court, either by DOCCS or the parties' attorneys, could have effectuated the same result before Francis's federal sentence expired.   The sentencing court and the parties' attorneys should have the opportunity to take steps, if necessary, to adjust a prisoner's sentence in order to avoid legal problems identified by prison officials.

Third and finally, we consider "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."   *Mathews*, 424 U.S. at 335.   The governmental "function involved" here, *id.*—prison officials' implementation of an inmate's sentence—was essentially ministerial.   Prison officials are charged with effectuating the sentencing court's sentence, filing a detainer if necessary, arranging for transfers between various jurisdictions, and the like.   The ministerial nature of the role makes the addition of extra levels of procedure particularly feasible.   Moreover, the "fiscal and administrative burdens"

36

attendant upon the procedures contemplated above, *id.*, would be minimal. While Fiacco noted that "it was not wholly uncommon to receive a NYS Sentence and Commitment that was illegal by operation by law," J.A. 43, we suspect that only a small minority of cases feature a sentencing court directive that squarely contradicts New York law. Even in those few cases, the additional procedural protections detailed above would impose almost no fiscal or administrative burdens on the government at all. DOCCS need only promptly dispatch a letter informing the sentencing court and the parties' attorneys that prison officials cannot, under the law, implement the court's intended directive of concurrency.

Not only would the fiscal or administrative burdens attendant upon these additional procedures be negligible, but state law already requires the government to provide the protections we have described above under similar circumstances. Pursuant to New York statute:

> Whenever it shall appear to the satisfaction of [DOCCS] based on facts submitted on behalf of a person sentenced and confined in a state prison, that any such person has been erroneously sentenced, it shall be the duty of the department to communicate with the sentencing court, the inmate's defense attorney and the district attorney of the county in which such person was convicted.

N.Y. Correct. Law § 601-a. The State Defendants represent that "[i]t is DOCCS's practice to provide detailed notice to sentencing courts regarding any errors in

sentencing and the potential effects of those errors on its calculations of prisoner sentences." Defs.-Apps. Br. 54. (They concede, however, that "[w]hile such a notice may have been provided in this case, there is no evidence to that effect in the record." *Id.*) Therefore, to the extent that DOCCS typically provides notice under these circumstances, the procedural protections we have described impose precisely *no* additional burden on the government. In short, the only effect of today's decision on the operations of the government is to clarify that, in this context, obligations like those imposed by section 601-a are of constitutional as well as statutory dimension.

To review our *Mathews* analysis: The private interest at stake here is Francis's interest in freedom from detention, a liberty interest that sits at the very heart of the Due Process Clause. The "risk of an erroneous deprivation" of that interest under the procedures followed in this case is unacceptably high, and the "probable value . . . of [the] additional or substitute procedural safeguards" we have proposed is substantial. *Mathews*, 424 U.S. at 335. Finally, the fiscal or administrative burdens that the government will sustain as a result of this additional process are at most negligible; more likely, assuming future compliance with state law, DOCCS will sustain no burden at all. We thus hold that prison

officials implementing a sentence that, as pronounced, appears to be in error under applicable law must, at a minimum, promptly inform the prisoner, the sentencing court and the attorneys for both parties of their determination that the sentence as pronounced by the sentencing court cannot be lawfully implemented. The reasons for this conclusion should also be provided. In the circumstances of Francis's case, the State Defendants violated the Due Process Clause by failing to provide these basic procedural protections.

## III.

We now address the question whether, notwithstanding the constitutional violation identified above, qualified immunity nonetheless protects the State Defendants from Francis's claims for damages. We note, once again, the relevant legal standard: Qualified immunity applies to defeat a federal claim "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ricciuti*, 834 F.3d at 167 (quoting *al-Kidd*, 563 U.S. at 735). We focus now on the second prong of the inquiry, which "protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (internal quotation marks and citation omitted).

The Supreme Court has lately emphasized the breadth of qualified immunity protection. *See, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). While the Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks, citation, and brackets omitted). That precedent "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Moreover, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality," *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) (quoting *al-Kidd*, 563 U.S. at 742), instead emphasizing that "clearly established law must be 'particularized' to the facts of the case," *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In short, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal

questions" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). With that standard in hand, we now consider whether qualified immunity protects the State Defendants from Francis's constitutional claims.

**A.**

We begin with Francis's Fourteenth Amendment claim. We identify two potential sources of "clearly established" law that might support this claim: first, the principles articulated in *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936), and *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006); and second, the traditional procedural due process balancing test from *Mathews*, which we have applied above. We consider each of these potential sources in turn.

**1.**

In rejecting the State Defendants' claim of qualified immunity, the district court relied heavily on *Wampler* and *Earley*. Those two cases, the court reasoned, "clearly established [the principle] that a criminal defendant had the right not to be imprisoned for a significant period of time after he or she should have been released pursuant to the terms of the sentence." S.A. 34. Given the holdings of those two cases, the court concluded, the State Defendants' "only permissible

41

course was to release [Francis] or bring the issue to the attention of the district attorney, [Francis's] criminal counsel, and/or the state court." S.A. 35.

In *Wampler*, the sentencing court had imposed various fines and costs on Wampler following his conviction for attempted tax evasion. The clerk of that court, acting in accordance with court policy, had added to Wampler's commitment letter one further provision: that "in default of payment of said fines and costs, [Wampler] stand further committed until the payment of said fines and costs or until discharged by due process of law." *Wampler*, 298 U.S. at 462. The Supreme Court struck down this additional condition of Wampler's federal sentence because the clerk of court, rather than the sentencing court itself, had imposed it. Without making any mention of the Constitution, the Court reasoned that "[t]he choice of pains and penalties, when choice is committed to the discretion of the court . . . must have expression in the sentence." *Id.* at 464. It also articulated the broad notion that "[t]he only sentence known to the law is the sentence or judgment entered upon the records of the court." *Id.*

In *Earley*, the sentencing court had sentenced Earley to six years' incarceration pursuant to a plea agreement. DOCCS subsequently added a five-year term of post-release supervision to Earley's sentence, as required by a then-

42

recent New York law. The sentencing court had made no mention of any term of post-release supervision in Earley's written sentence or commitment order. In considering Earley's *habeas corpus* petition, the Second Circuit concluded that *Wampler* had clearly established the principle that "[t]he judgment of the court establishes a defendant's sentence, and that sentence may not be increased by an administrator's amendment." *Earley*, 451 F.3d at 75. As the Court explained, *Wampler* stood for the broad proposition that "[t]he only cognizable sentence is the one imposed by the judge," and that "[a]ny alteration to that sentence, unless made by a judge in a subsequent proceeding, is of no effect." *Id.* The Court therefore vacated the lower court's denial of Earley's *habeas* petition.

*Wampler* and *Earley* did not clearly establish the unconstitutionality of the State Defendants' conduct here. Two features of Francis's case in particular distinguish it from those precedents. First, *Wampler* and *Earley* concerned the augmentation of a defendant's sentence with additional conditions found nowhere in the original commitment order. In *Wampler*, the clerk added a further penalty: that Wampler would be detained until he had paid the fines and costs that the court had imposed upon him. In *Earley*, DOCCS unilaterally imposed a five-year term of supervised release that the sentencing court had never

43

mentioned.    Here, by contrast, the State Defendants did not augment Francis's sentence with any novel conditions; the state court imposed a three-year maximum term of imprisonment and DOCCS did not purport to add any further penalties.    Instead, the State Defendants merely *declined* to implement a directive of concurrency contained in the original sentence because, as the sentencing court itself later explained, the directive of concurrency was rendered invalid "by operation of law."    J.A. 89.    Thus, while Francis's case clearly implicates the broad dicta of *Wampler* and *Earley*, the nature of the official conduct in question—declining to implement one aspect of a sentence on the ground that state law did not authorize it—is different.

More significantly, the sentences in *Wampler* and *Earley*—and the unlawful additions to those sentences—did not implicate the interaction between two sentences imposed by different jurisdictions.    A sentencing court's directive that a state sentence should run concurrently with a federal sentence alters the practical impact of the both sentences.    Such a directive may implicate sensitive issues of federalism—for instance, if a state court indicates that the defendant's two sentences should run concurrently but the federal court directs them to run consecutively.    New York has an obvious interest in addressing such issues and

44

has apparently attempted to do so by providing for concurrent sentencing only where the defendant being sentenced "is subject to an undischarged term of imprisonment imposed at a previous time by a court of another jurisdiction." N.Y. Penal Law § 70.30(2-a). The State Defendants faced a situation where that legislative judgment seemingly conflicted with the state court's attempt to run Francis's state sentence concurrently with his future federal sentence, and they reasonably concluded that New York's legislative scheme required them to follow a certain course of action while coordinating the two sentences. Whatever *Wampler* and *Earley* establish with respect to the administrative alteration of sentences, they do not speak clearly to a situation like this one, which presented DOCCS with complicated considerations not addressed in those prior cases.

Our decision in *Sudler v. City of New York*, 689 F.3d 159 (2d Cir. 2012), places particular force behind this second distinction. In *Sudler*, we confronted a similar lawsuit over DOCCS officials' failure to implement a state court's directive of concurrency at sentencing. Sudler, the lead plaintiff, had pleaded guilty in state court to petit larceny charges and the sentencing court had directed that his two nine-month sentences for those charges run concurrently with his preexisting sentence on a separate state charge. Sudler served his petit larceny sentences in

the custody of New York City. When New York State retook custody of Sudler so that he might resume serving his prior state sentence, however, DOCCS officials refused to credit him for the time he had just served in City custody—contravening the sentencing court's explicit directive. By the time Sudler was finally discharged from State custody, he had served six months more than he would have if DOCCS had credited him for the time he had served in City custody.

As Francis did here, Sudler brought suit against the relevant DOCCS officials pursuant to 42 U.S.C. § 1983, arguing that *Wampler* and *Earley* had clearly established the illegality of the DOCCS officials' conduct. We disagreed and held that the officials were entitled to qualified immunity. The Court explicitly noted that "[n]either *Earley* nor *Wampler* addresses a situation like the one at bar, . . . involving not one sentence but the relationship between one sentence and another sentenced imposed by a different judge in a separate proceeding." *Sudler*, 689 F.3d at 171. With respect to *Earley*, we also reiterated that "[its] holding, by its terms, does not instruct prison administrators as to the calculation of release dates when multiple sentences are at issue—and, indeed, one sentencing judge's instructions may conflict with another's." *Id.* at 175. Accordingly, the Court declined to "resolve the parties' . . . disagreement as to the scope of *Wampler* and

46

*Earley*" and concluded that "the State Defendants [were] entitled to qualified immunity on the [the plaintiffs'] claim." *Id.* at 173.

While the facts of this case are not identical to those in *Sudler*, the same analysis applies. *Sudler* expressly declined to resolve the question whether *Wampler* and *Earley* "should apply not only with regard to a single sentence, but also in the context of a sentencing judge's pronouncement as to the relationship between the sentence he is imposing and another sentence imposed in a separate proceeding." *Id.* Instead, the Court held that qualified immunity protected the State Defendants because the answer to that question had not been clearly established. *Id.* at 174–77. No case since *Sudler* has provided further guidance on the extent of *Wampler* and *Earley*'s reach, so Defendants-Appellants should receive qualified immunity again here. As in *Sudler*, the facts "are sufficient to convince us that the asserted unlawfulness of the State Defendants' conduct in calculating [the plaintiff's] release date would not have been apparent to reasonable prison officials." *Id.* at 176.

In short, in light of the distinctions we have identified above, along with the reasoning we applied in *Sudler*, we cannot say that "every reasonable official

47

would interpret [*Wampler* and *Earley*] to establish" the unconstitutionality of the State Defendants' conduct in *this* case. *Wesby*, 138 S. Ct. at 590.

**2.**

We concluded above, without relying on *Wampler* and *Earley*, that the State Defendants violated the Due Process Clause pursuant to the traditional three-factor balancing test from *Mathews v. Eldridge*. *See supra* Part II. We held that the Due Process Clause required the State Defendants to notify the sentencing court, as well as the attorneys for both parties at sentencing, prior to implementing Francis's sentence in a manner that deviated from the sentencing court's original pronouncement. We now consider whether *Mathews* and its progeny had "clearly established" those constitutional requirements at the time when the State Defendants engaged in the course of conduct at issue here.

The Supreme Court has repeatedly emphasized that "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961)). To the contrary, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481. The traditional

48

*Mathews* balancing test embodies that flexibility, requiring courts to weigh three highly fact-bound considerations with respect to any potential procedural innovation that the parties might propose. Given this flexible, context-dependent approach, it will be a rare case in which prior precedents have definitively resolved a novel claim of procedural due process. That makes particularly fertile ground for qualified immunity, given that state officials can be liable only for violations of rights that have been established "beyond debate" and with "particular[ity]" by existing constitutional precedents. *White*, 137 S. Ct. at 551–52.

With respect to this case in particular, precedent had not clearly established the due process requirements we identified above at the time of the State Defendants' conduct. Indeed, no case of which we are aware has even hinted that the Constitution might require the specific procedural protections we have now prescribed. Once again, the most closely analogous precedent is *Sudler*, where we affirmed a grant of qualified immunity to prison officials faced with a similar claim. One of Sudler's co-defendants, relying partially on *Earley*, had argued that the officials violated the Due Process Clause by failing to provide additional procedural protections that a *Mathews* balancing test would have

49

required.  We noted that *Earley* "does not employ the familiar three-factor analysis [from *Mathews*] . . . to delineate what process prison officials should undertake to avoid impermissibly extending sentences in the context of implementing them" and that "the State Defendants had little guidance in weighing the three *Mathews* factors in the circumstances confronting them." *Sudler*, 689 F.3d at 175, 177; *see also id.* at 177 ("The State Defendants cannot be expected to have divined answers to [those] questions at the time of their allegedly illegal conduct.").  Once again, *Sudler*'s analysis applies here.  No case before or after *Sudler* has even considered whether prison officials implementing a state sentence violate the Constitution by failing to provide notice to the sentencing court and attorneys, let alone subjected such a claim to a *Mathews* analysis. Accordingly, though we identify a constitutional violation pursuant to such an analysis, we conclude that qualified immunity protects the State Defendants from damages liability under the circumstances of this particular case.

**B.**

We conclude with Francis's Eighth Amendment claim.  Francis claims that the State Defendants violated his rights under the Eighth Amendment by incarcerating him for longer than his duly imposed sentence.  The Eighth

Amendment provides that "cruel and unusual punishments" shall not be "inflicted." U.S. Const. amend. VIII. A plaintiff asserting an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 must meet two requirements. "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, "the charged official must act with a sufficiently culpable state of mind." *Id.* (citing *Wilson*, 501 U.S. at 298).

No Supreme Court or Second Circuit caselaw has clearly established either prong of the particular Eighth Amendment claim that Francis asserts here. With respect to objective seriousness, Francis remained in prison for four months beyond the expiration of his federal sentence as a result of the State Defendants' actions. No case establishes that these four months of additional incarceration, although of serious dimension, crossed the threshold of sufficient objective seriousness to constitute "cruel and unusual punishment[]" under the Eighth Amendment. Similarly, with respect to the State Defendants' subjective mental states, an Eighth Amendment violation typically requires "a state of mind that is the equivalent of criminal recklessness." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (1996); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[T]his standard requires

that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability." *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). No case has found this standard met under circumstances like these, where the State Defendants weighed the proper course of action, acted in accordance with a reasonable understanding of a complicated area of state law, and relayed the legal basis for their actions to Francis in response to his subsequent inquiries.   Indeed, state officials such as these ought to strive to understand and scrupulously adhere to state law, albeit while demonstrating proper consideration for a sentencing court's pronouncements and the need to seek clarification when such pronouncements appear to conflict with state law.

The district court did not conduct any particularized qualified immunity analysis with respect to Francis's Eighth Amendment claim.[11]   In accepting the merits of that Eighth Amendment claim, though, the district court relied on two out-of-circuit cases: *Haygood v. Younger*, 769 F.2d 1350 (9th Cir. 1985) (en banc), and *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989).   Out-of-circuit caselaw is relevant to the qualified immunity analysis only where the cases "clearly foreshadow a

---

[11] As noted above, the district court's qualified immunity analysis relied mainly on *Wampler* and *Earley*, neither of which makes any reference to the Eighth Amendment, cruel and unusual punishment, or any Eighth Amendment caselaw.

particular ruling on the issue." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (internal quotation marks and citation omitted).

Neither *Haygood* nor *Sample* "clearly foreshadow[ed]" a favorable ruling for Francis with respect to either prong of the Eighth Amendment analysis. *Id.* In *Haygood*, the plaintiff served an additional *five years* in prison due to an admittedly *erroneous* determination by prison officials as to the requirements of state law. 769 F.2d at 1352–53. *Sample* similarly concerned an erroneous calculation that led to the plaintiff serving an additional nine months after all three of his sentences had independently expired or been vacated. 885 F.2d at 1104–05. Here, Francis served four months of his three-year state sentence because the sentencing court's intended directive of concurrency was concededly void "by operation of law." J.A. 89. In addition, both *Haygood* and *Sample* involved prison officials who were found to be "deliberately indifferent" to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors. *Haygood*, 769 F.2d at 1355; *Sample,* 885 F.2d at 1111. Here, the State Defendants had nothing to investigate: they correctly determined that the sentencing court's directive was invalid under New York law. Francis argues that the Eighth Amendment required these prison officials nonetheless to comply with the invalid

sentencing directive. But, with respect to both objective seriousness and subjective culpability, Francis's Eighth Amendment claim bears little comparison with the out-of-circuit cases on which he relies. In sum, whatever we might think of the merits of Francis's claim, it is clear that "existing precedent" has not "placed the . . . constitutional question beyond debate." *White*, 137 S. Ct. at 551.

In short, we are aware of no precedent clearly establishing an Eighth Amendment right that the State Defendants violated under the circumstances of this case. We therefore hold, without addressing the merits of Francis's Eighth Amendment claim, that the claim must fail on qualified immunity grounds.

## CONCLUSION

We have considered all of Francis's remaining arguments and deem them either waived or without merit. For the reasons stated in this opinion, we REVERSE the district court's order and REMAND with instructions to grant the State Defendants' motion for summary judgment on qualified immunity grounds.