*Hurd v. Fredenburgh*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term 2020

(Argued: November 18, 2020 | Decided: January 12, 2021)

Docket No. 19-3482

DEVAR HURD,

*Plaintiff-Appellant*,

v.

STACEY FREDENBURGH, IN HER INDIVIDUAL CAPACITY,

*Defendant-Appellee.*†

————————

Before:

WALKER, KATZMANN, WESLEY, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Matsumoto, *J.*), dismissing the complaint for failure to state a claim.

Because of errors in his sentencing calculation, Plaintiff-Appellant Devar Hurd was incarcerated for almost a year past the date on which state law mandated his release. Hurd sued Defendant-Appellee Stacey Fredenburgh, a New York State prison official, alleging that she violated his Eighth and Fourteenth Amendment rights by keeping him imprisoned based upon those errors. The district court concluded that Hurd's alleged injury was not cognizable

---

† The Clerk of the Court is directed to amend the official caption as set forth above.

under either constitutional provision and, in the alternative, that Fredenburgh was entitled to qualified immunity.

We agree with the district court that the complaint should be dismissed, but agree with its reasoning only in part. Contrary to the district court's determination, we hold that Hurd alleged a harm of constitutional magnitude under the Eighth Amendment because New York State lacked authority to detain him past his mandatory conditional release date. We also hold that Hurd had a liberty interest in his right to conditional release protected by the Fourteenth Amendment's substantive due process clause, and the district court erred in concluding otherwise. But because neither of these rights was clearly established before today, Fredenburgh is entitled to qualified immunity for any responsibility she may have had for Hurd's prolonged detention.

Accordingly, we **AFFIRM** the judgment of the district court.

_____

JACOB LOUP (Joel B. Rudin, *on the brief*), Law Offices of Joel B. Rudin, P.C., New York, NY, *for Plaintiff-Appellant*.

LINDA FANG, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, New York, NY, *for Defendant-Appellee*.

_____

WESLEY, *Circuit Judge*:

Devar Hurd was charged in a single state indictment with nine misdemeanors and one felony, which took three trials to resolve. He remained in local custody throughout the lengthy trial process. Hurd received a sentence specific to each conviction, but those sentences merged into one by operation of New York law. When Hurd was transferred into state custody to serve what

became his single felony sentence, his credit for time already served and good behavior entitled him to immediate release. But Hurd was not released from state custody for nearly a year. He contends this prolonged incarceration violated his rights under the Eighth Amendment and the Fourteenth Amendment's substantive due process clause.

## BACKGROUND[1]

Devar Hurd was arrested in July 2013 and indicted for seven counts of misdemeanor criminal contempt in the second degree, one count of misdemeanor stalking in the fourth degree, one count of misdemeanor harassment in the first degree, and one count of felony stalking in the second degree. He was held in the custody of the New York City Department of Correction ("NYCDOC") following his arrest, where he remained during multiple trials on the indictment.

Hurd's first trial in December 2014 ended in a mistrial. At his retrial in October 2015, the jury convicted Hurd of the nine misdemeanor counts; the state court declared a mistrial on the felony. The state court imposed a set of definite sentences for the misdemeanors ranging from 90 days to one year each, to run consecutive to the others, in the custody of NYCDOC. Under New York law,

---

[1] Except as otherwise noted, these facts are as alleged in Hurd's First Amended Complaint.

3

however, because the aggregate term of these definite sentences exceeded two years, Hurd's term of imprisonment on the misdemeanor counts was capped at two years. *See* N.Y. Penal Law § 70.30(2)(b).

Hurd faced another retrial on the felony count in March 2016; the jury convicted him of stalking in the second degree. The state court sentenced Hurd to an indeterminate sentence with a minimum of one-and-one-third years and a maximum of four years, to be served in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Because the state court did not specify the manner in which Hurd's felony sentence was to run, New York law mandated that it would run concurrently with his two-year sentence on the misdemeanors. *See id.* § 70.25(1)(a). Hurd's misdemeanor and felony sentences also merged by operation of New York law. *See id.* § 70.35. Thus, Hurd's maximum sentence on the indictment was four years.

Hurd would not have to serve four full years in prison after his sentence was imposed, however. New York law provides that any sentence "shall be credited with and diminished by the amount of time the person spent in custody prior to the commencement of such sentence as a result of the charge that culminated in the sentence." *Id.* § 70.30(3). This is known as "jail-time credit."

4

Thus, Hurd was entitled to credit against his maximum four-year "state sentence" for all the time he spent in NYCDOC custody from his arrest in July 2013 to his transfer to DOCCS custody in April 2016.

New York law also provides for "good-time credit," whereby an inmate "may receive time allowance against the term or maximum term of his or her sentence . . . for good behavior . . . ." N.Y. Corr. Law § 803(1)(a). Once good-time credit is approved, an inmate "*shall*, if he or she so requests, be conditionally released from the institution in which he or she is confined when the total good behavior time allowed to him or her . . . is equal to the unserved portion of his or her term, maximum term or aggregate maximum term." N.Y. Penal Law § 70.40(1)(b) (emphasis added). This is known as the inmate's "conditional release date."

The New York Court of Appeals has referred to a conditional release date as "the statutorily mandated release date, calculated by applying both his good behavior time and his jail time, or time served awaiting trial." *Eiseman v. New York*, 70 N.Y.2d 175, 180 (1987) (Kaye, *J.*) (internal quotation marks and citations omitted). Thus, conditional release under New York law is unlike parole, which is a discretionary decision reserved to the judgment of the parole board. As then-

Judge Kaye's explanation suggests, conditional release is a mathematical concept: an inmate will have completed their term of imprisonment when (1) the number of pre- and post-trial custody days served, plus (2) the number of approved days earned for good behavior, equals the inmate's sentence term. By sheer calculation of days, the inmate has satisfied their term of imprisonment, and they are entitled to immediate release from prison.

Hurd was transferred from NYCDOC custody into DOCCS custody in April 2016. Whenever an inmate is transferred from local to state custody, the local jurisdiction must calculate the inmate's jail-time credit and provide DOCCS with a certified record of that credit. *See* N.Y. Corr. Law § 600-a. Accordingly, NYCDOC officials issued a "Jail Time Certification" ("JTC"), confirming that Hurd was entitled to 996 days of jail-time credit against his maximum four-year sentence. DOCCS officials also produced a "Legal Date Computation," indicating Hurd's eligibility for good-time credit of up to one year and four months and jail-time credit of two years, eight months, and 26 days.

Assuming his good-time credit would be approved, the combination of his jail-time credit and good-time credit gave Hurd a conditional release date of March 17, 2016—pre-dating his transfer into DOCCS custody. This conditional release

6

date was reflected on the Legal Date Computation. Thus, at the time of his arrival in state custody, Hurd "was told that he was eligible to be immediately released." J.A. 17. DOCCS approved Hurd's good-time credit on April 19, 2016, at which point he satisfied the statutory requirements entitling him to conditional release.

DOCCS Inmate Records Coordinator Stacey Fredenburgh began to process Hurd's release documents. Hurd's complaint sets out a series of interactions between Fredenburgh and NYCDOC all centered around verifying the correct computation of his local jail-time credit. Without identifying a reason for any animus towards him, Hurd alleges that Fredenburgh and NYCDOC employees—most notably Principal Administrative Associate for NYCDOC's Legal Division, Edwin Felicien—"agreed to reduce Mr. Hurd's jail-time credit so that he would not be released." J.A. 17. Between April and June 2016, Felicien sent Fredenburgh four amended JTCs, each of which reflected a different, and much lower, jail-time credit than the 996 days reflected in the original JTC. It is undisputed that each of these revised JTCs was wrong. The last amended JTC credited Hurd with 508 days of jail-time credit. As a result, DOCCS no longer considered Hurd eligible for conditional release; Hurd remained in prison.

7

Hurd pursued the official grievance process, filed two notices of claim, and lodged informal letter complaints to prison officials, including Fredenburgh, protesting that he was being held past his conditional release date. Fredenburgh responded in a letter to Hurd, telling him "that she could do nothing to address his concerns and that he must contact 'Rikers Island'" (an apparent reference to NYCDOC). J.A. 19. DOCCS took no other action in response to Hurd's complaints.

Finally, Hurd's counsel contacted NYCDOC's legal department on March 20, 2017. Three days later, NYCDOC sent an amended JTC crediting Hurd with the original 996 days of jail-time credit. DOCCS released Hurd on March 30, 2017—11 months and 11 days after the date on which he was entitled to immediate release.

Hurd filed the instant lawsuit under 42 U.S.C. § 1983 against New York City (the "City"), an NYCDOC employee, and Fredenburgh for violating his rights under the Eighth Amendment and the Fourteenth Amendment's substantive due process clause. Hurd settled with the City defendants. The district court thereafter granted Fredenburgh's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, holding that the prolonged imprisonment

8

beyond Hurd's mandatory conditional release date was not a cognizable injury under the Eighth and Fourteenth Amendments, and, in the alternative, that Fredenburgh was entitled to qualified immunity.

Hurd also filed a state law false imprisonment claim in New York's Court of Claims. Two weeks after the district court dismissed Hurd's § 1983 complaint, the Court of Claims granted summary judgment for the State, concluding that Fredenburgh acted reasonably considering her state law obligations and that Hurd's prolonged detention was attributable to the City's errors only.[2]

The Court of Claims noted that NYCDOC has the obligation under Penal Law § 600-a to send a JTC to DOCCS when an inmate is transferred from local to state custody. It noted further that the State "is bound by the jail time certifications it receives from local authorities and 'may not add or subtract therefrom.'" Add. 34 (quoting *McLamb v. Fischer*, 70 A.D.3d 1090, 1091 (3d Dep't 2010)); *see also Torres*

---

[2] The parties dispute whether we can (or should) consider the Court of Claims record in resolving this appeal. As discussed below, we need not answer this question. We take judicial notice of that court's decision only to establish its existence and that the court made certain factual findings, which is necessary to complete the narrative of Hurd's federal action and provide context for Fredenburgh's defenses. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). We do not give any effect to those factual findings, nor do we consider them for their truth or use them to support any factual determination (for we make none) in this appeal.

*v. Bennett*, 271 A.D.2d 830, 831 (3d Dep't 2000). Although the State "changed its policy in 2014 to take affirmative steps to review a local commitment order after an inmate is returned to state custody from a local jail," *Torres v. New York*, 149 A.D.3d 1290, 1292 n.* (3d Dep't 2017), the Court of Claims found that Fredenburgh's communications with Felicien satisfied the necessary review.

The Court of Claims concluded that, although "Fredenburgh's actions may have resulted in DOCCS receiving incorrect information, . . . her actions were reasonable at the time." Add. 35. It reasoned that the City's errors caused Hurd's prolonged detention, and Hurd's proper recourse was against the City, not the State. Hurd did not appeal the decision.

Hurd did appeal the dismissal of his federal complaint.

## DISCUSSION

We review *de novo* a district court's decision granting a Rule 12(b)(6) motion, including on qualified immunity grounds. *See Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019); *Charles W. v. Maul*, 214 F.3d 350, 356 (2d Cir. 2000). In conducting our review, we "accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez*, 939 F.3d at 198 (citation omitted).

10

The crux of both of Hurd's constitutional arguments is that "[o]n April 19, 2016, Hurd had enough jail-time credit and approved good-time credit to make his conditional release from prison *mandatory* under state law. However, Fredenburgh worked with an official of [NYCDOC] to reduce Hurd's jail-time credit so that he would not be released on his mandatory conditional release date . . . ." Appellant Br. 2–3. The district court rejected this theory, determining that neither the Eighth Amendment nor the Fourteenth Amendment's substantive due process clause protects an inmate's right to, or interest in, conditional release under state law. The district court concluded that Hurd failed to plead a violation of his Eighth Amendment rights because "he was released prior to the date his maximum sentence expired," J.A. 39, and that Hurd failed to allege a violation of his Fourteenth Amendment rights because he "has no substantive due process right to conditional release" before the expiration of his maximum sentence, J.A. 51, 54.

After finding that Hurd failed to state a claim for violations of his Eighth or Fourteenth Amendment rights, the district court concluded in the alternative that Fredenburgh was entitled to qualified immunity. We agree with the district

11

court's latter determination, but we disagree with its conclusions that Hurd did not plausibly allege harm to either his Eighth or Fourteenth Amendment rights.[3]

## I. Eighth Amendment

"A plaintiff asserting an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 must meet two requirements. First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable state of mind." *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To satisfy the first requirement, a plaintiff must plead "a harm of a magnitude that violates a person's eighth amendment rights." *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647, 654 (2d Cir. 1993) (internal quotation

---

[3] Our qualified immunity analysis "is guided by two questions: first, whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights, and second, whether the right was clearly established at the time of the defendants' actions." *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014) (internal quotation marks, alteration, and citation omitted). "We may address these questions in either order," and "[i]f we answer either question in the negative, qualified immunity attaches." *Id.* Although it has become the virtual default practice of federal courts considering a qualified immunity defense to assume the constitutional violation in the first question and resolve a case on the clearly established prong, "it is often beneficial" to analyze both prongs of the qualified immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "[T]he two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* This is such a case.

marks and citation omitted). "The Eighth Amendment[] . . . proscribes more than physically barbarous punishments. It prohibits penalties that are grossly disproportionate to the offense, as well as those that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Hutto v. Finney*, 437 U.S. 678, 685 (1978) (internal quotation marks, alteration, and citations omitted).

The constitutional claim is not measured by the punishment alone, for "an Eighth Amendment violation typically requires a state of mind that is the equivalent of criminal recklessness." *Francis*, 942 F.3d at 150 (internal quotation marks and citation omitted). "This standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability." *Id.* (alteration and citation omitted). Under this standard, prison officials can be found "deliberately indifferent to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors." *Id.* at 151 (internal quotation marks and citations omitted).

The district court concluded that Hurd failed to allege a harm of constitutional magnitude because he was released before his maximum sentence expired. We disagree. The Eighth Amendment prohibits "the unnecessary and

wanton infliction of pain," including punishments that are "totally without penological justification." *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976). There is no penological justification for incarceration beyond a mandatory release date because "any deterrent and retributive purposes served by [the inmate's] time in jail were fulfilled as of that date." *See Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989).

"Next to bodily security, freedom of choice and movement has the highest place in the spectrum of values recognized by our Constitution." *Id.* at 1109. For that reason, unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis.[4] Hurd's unauthorized imprisonment for

---

[4] We acknowledge that, in *Calhoun*, we stated that a "five-day extension of [the plaintiff's] release date did not inflict 'a harm of a magnitude' that violates a person's eighth amendment rights." 999 F.2d at 654. But we did not announce this as a constitutional rule. The single paragraph devoted to the plaintiff's Eighth Amendment claim in *Calhoun* included only a descriptive, rather than normative, discussion of this issue, and we are not bound by its conclusion in announcing a constitutional rule here.

Indeed, in *Calhoun* we cited to *Sample*, which relied on the deliberate indifference prong as dispositive in cases of unavoidable administrative delay, mistakes, errors, and accidents. *See, e.g.*, *Sample*, 885 F.2d at 1109 ("Because such discretion is necessary to the administration of prisons, an official acting in good faith within that discretion, although in the process perhaps injuring an inmate, has not inflicted a cruel and unusual punishment upon that inmate."). This approach—recognizing a harm of constitutional magnitude whenever an inmate is detained without authorization but finding a

almost one year certainly qualifies under that standard. *See id.* ("Detention for a significant period beyond the term of one's sentence inflicts a harm of a magnitude [recognized under the Eighth Amendment].").

It matters not that Hurd was detained past his statutory conditional release date as opposed to the expiration of the maximum sentence imposed on him by the sentencing judge. By using the word "shall," New York chose to make conditional release mandatory upon the approval of good-time credit and the inmate's request for release. *See* N.Y. Penal Law § 70.40(1)(b). It is the mandatory nature of that release, not the label of "conditional" or "maximum," that is dispositive.

In effect, Hurd's conditional release date became the operative date on which his maximum term of imprisonment expired. Once Hurd met the statutory requirements for conditional release, his release from prison was mandatory under state law. Fredenburgh does not dispute that DOCCS had no authority to keep Hurd incarcerated past his conditional release date for the crimes of which

---

constitutional violation only where that harm is deliberately inflicted—avoids the arbitrary task of distinguishing between the permissible and impermissible length of unauthorized detention under the Constitution. Moreover, it reflects the notion that freedom from unlawful restraint is a right so core to our understanding of liberty that suffering even one day of unlawful detention is a harm recognized by the Constitution.

15

he was convicted and sentenced.  Even assuming the State could impose some

supervisory conditions following Hurd's release,[5] his continued *imprisonment* was

a punishment that was neither authorized by law nor justified by any penological

interest asserted by the State.  *See Sample*, 885 F.2d at 1108.  Because the State

detained him for over 11 months past the last date on which New York law

authorized his imprisonment, Hurd suffered a harm of constitutional magnitude

under the Eighth Amendment.  The district court erred in concluding otherwise.

That does not mean Hurd suffered a violation of his Eighth Amendment

rights, however.  Nor does it mean an inmate whose release is not processed on

their conditional release date is entitled to damages under § 1983.  Far from it.  If

a period of prolonged detention results from discretionary decisions made in good

faith, mistake, or processing or other administrative delays, as opposed to the

deliberate indifference of prison officials, then there is no Eighth Amendment

---

[5] New York law provides that inmates granted conditional release "shall be under the supervision of the state department of corrections and community supervision for a period equal to the unserved portion of the [maximum] term," and that "[t]he conditions of release, including those governing post-release supervision, shall be such as may be imposed by the state board of parole in accordance with the provisions of the executive law."  N.Y. Penal Law § 70.40(1)(b); *see also* N.Y. Exec. Law § 259-c(2) (granting the state board of parole authority of "determining the conditions of release of the person who may be . . . conditionally released").  As noted above, the State's right to impose *some* form of punishment through supervision or other conditions of release (if any) does not justify a punishment of *imprisonment* that is unauthorized by law.

16

liability. The deliberate indifference prong will do most of the work under these and similar circumstances, as "[t]he degree to which a harm is 'unnecessary' in the sense of being unjustified by the exigencies of prison administration will affect the state-of-mind requirement a plaintiff must meet to demonstrate that a particular prison official violated the eighth amendment." *Sample*, 885 F.2d at 1109.

To that end, the district court concluded that "Fredenburgh's alleged conduct is troublesome and would certainly satisfy deliberate indifference if not willfulness, as [Hurd] alleges Fredenburgh *agreed* with Felicien to keep [Hurd] incarcerated past his conditional release date." J.A. 57. Fredenburgh argues that collateral estoppel applies here because of the Court of Claims' finding that she acted reasonably under the circumstances, and that Hurd is therefore precluded from arguing that Fredenburgh acted with deliberate indifference.

Regardless of the Court of Claims' decision, we are skeptical that Fredenburgh—whom Hurd failed to demonstrate has any authority or duty to change an erroneous JTC from the City—can be deliberately indifferent to any harm suffered because of that error. There must be "a causal connection between the official's response to the problem and the infliction of the unjustified detention," *Sample*, 885 F.2d at 1110, and if Fredenburgh could not do anything

17

about Hurd's prolonged detention as a matter of law, then any deliberate indifference on her part would likely be irrelevant.

For example, in this case, Hurd cites to no authority or factual allegations establishing that Fredenburgh had an obligation under New York law or DOCCS policy to confirm the accuracy of the JTCs she received. Nor is it clear how Fredenburgh would or could have accomplished that, given that Penal Law § 600-a delegates the sole responsibility for certifying jail-time credit to NYCDOC, and the relevant information would be contained within NYCDOC records regardless. Nor are there any allegations that the prison had "procedures in place calling for [Fredenburgh] to pursue the matter," or that "given . . . [Fredenburgh's] job description or the role . . . she has assumed in the administration of the prison, [the jail-time credit] calculation problem will not likely be resolved unless . . . she addresses it or refers it to others . . . ." *Id.* Hurd's legal conclusion that Fredenburgh had such a duty or responsibility is not entitled to unquestioned acceptance at the motion to dismiss stage.

We acknowledge that Hurd's allegations do not concern only Fredenburgh's ability to change his jail-time credit but also her alleged conduct in agreeing to create the erroneous JTCs to keep Hurd in prison in the first place. As

18

the district court concluded, such allegations could amount to deliberate indifference. We need not resolve this issue. Nor do we reach the issue of whether the Court of Claims' reasonableness finding has preclusive effect here. Because it was not clearly established that prolonged detention past one's mandatory conditional release date constitutes a harm of constitutional magnitude under the Eighth Amendment, Fredenburgh is entitled to qualified immunity on Hurd's claim. Before addressing that point, however, we turn to Hurd's Fourteenth Amendment argument.

## II. Fourteenth Amendment

The Fourteenth Amendment guarantees "more than fair process"; it "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (internal quotation marks and citations omitted). "Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).

"The first step in substantive due process analysis is to identify the constitutional right at stake." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d

19

Cir. 1995). Next, the plaintiff "must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Southerland*, 680 F.3d at 151–52 (internal quotation marks and citation omitted). "The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.* at 152 (internal quotation marks and citation omitted).

The district court rejected Hurd's substantive due process claim, concluding that he lacked a cognizable liberty interest in conditional release because it is a state-created right. We disagree.

The district court reasoned that conditional release "is clearly a state-created right, as the Supreme Court has held that conditional release is not protected by the Constitution." J.A. 51. Although "[t]here is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence," *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011), that does not establish that state inmates lack a liberty interest in conditional release where the state has created a statutory mechanism providing for *mandatory* conditional release for eligible inmates. It means only that an inmate has no constitutional right to demand or

20

expect conditional release where the incarcerating authority does not offer such an opportunity under its law.[6]

Because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action[,] . . . commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (internal quotation marks and citations omitted); *see also Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (noting that individuals have a "protected liberty interest in being free from wrongful, prolonged incarceration"). Inmates eligible for mandatory conditional release are not limited to the confines of procedural due process in protecting that right. *Cf. Swarthout*, 562 U.S. at 220. They also are

---

[6] Along these lines, the district court relied on our reaffirmation in *Graziano v. Pataki*, 689 F.3d 110, 114–15 (2d Cir. 2012) (per curiam), that New York inmates lack a liberty interest in parole because New York's parole scheme does not create a legitimate expectation of release. But New York's parole scheme differs from the promise of conditional release. No inmate is entitled to parole; it is a discretionary decision reserved to the judgment of the parole board. *See id.* at 113–14. *All* state inmates are eligible for conditional release. Unlike parole, where inmates have only a possibility or probability of being granted the chance to complete their sentence outside prison, inmates such as Hurd who satisfy the statutory requirements for conditional release are guaranteed immediate release from prison. That difference creates a legitimate expectation of release, and by extension a liberty interest protected by the due process clause.

21

entitled to substantive due process protection against egregious and arbitrary government interference.

Substantive due process protects rights that are rooted in the principles of ordered liberty. Freedom from unlawful restraint is exactly that. Hurd remained in prison for almost one year while the State lacked any authority to further detain him. Because New York's conditional release scheme is mandatory, there is no meaningful difference in Hurd's liberty interest in release from prison at the expiration of his maximum sentence and conditional release when he became entitled to an earlier release date. Once Hurd's good-time credit was approved, the expiration date of his maximum term of imprisonment and his "conditional" release date were one and the same for substantive due process purposes.

It is of no moment that conditional release is a state-created right. Although many state-created rights are not recognized under the substantive due process clause, state-created rights that trigger core constitutional interests are entitled to its protection. *Cf. Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994) (explaining that the substantive due process clause does not protect "simple, state-law contractual rights, without more"). It is the nature of the right, not just its origin, that matters. Conditional

22

release under New York law is not akin to a state-created right of contract; it is a state-created right of mandatory release from prison, preventing unlawful continued physical restraint. *Cf. Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 198 (1979) ("[I]nterest[s] entitled to protection as a matter of substantive due process [must] resembl[e] the individual's freedom of choice with respect to certain basic matters of procreation, marriage, and family life." (internal quotation marks and citation omitted)); *see also Local 342*, 31 F.3d at 1196 (substantive due process protects rights that are "so vital that neither liberty nor justice would exist if they were sacrificed" (internal quotation marks and citation omitted)). That distinction makes all the difference. Once Hurd satisfied the statutory requirements for conditional release, he had a liberty interest in freedom from detention upon his conditional release date, as guaranteed by New York law.[7]

---

[7] Although Fredenburgh does not raise the issue, we acknowledge that the Supreme Court cautions against expanding the substantive due process clause where a more specific Amendment provides a source for protection against government conduct. *See, e.g.*, *Lewis*, 523 U.S. at 842. Our holding does not expand the protection of the Fourteenth Amendment's substantive due process clause, however. We are applying the clause to one of the explicit concepts it exists to protect: liberty from unjustified restraint. *Cf. Davis*, 375 F.3d at 714. Our conclusion that Hurd also alleged a harm of constitutional magnitude under the Eighth Amendment does not deprive him of a liberty interest in his mandatory conditional release.

Fredenburgh's error is considered at the second step of the substantive due process analysis—the nature of the alleged interference with Hurd's liberty interest. Specifically, we must determine whether Fredenburgh's conduct was egregious and shocking to the conscience.

The district court reasoned that, "if true, [Hurd's] allegations that Fredenburgh *intentionally* took actions to keep [Hurd] imprisoned without justification might shock the judicial conscience . . . ." J.A. 52. Here, too, Fredenburgh argues that collateral estoppel applies because of the Court of Claims' finding that she acted reasonably under the circumstances, which precludes any finding in this case that her conduct satisfied the high standard for a substantive due process violation. Again, we need not reach this issue, because it was not clearly established that Hurd had a liberty interest in his mandatory conditional release at the time of the sentencing miscalculations.

### III. Clearly Established Law

"Government actors are entitled to qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 432–33 (2d Cir. 2009) (internal quotation marks and citation omitted). "The relevant, dispositive inquiry in determining whether

24

a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 433 (citation omitted). "The principle of qualified immunity ensures that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (internal quotation marks and citation omitted).

Fredenburgh is entitled to qualified immunity under this standard. It was not clearly established during the period of Hurd's prolonged detention that an inmate suffers harm of a constitutional magnitude under the Eighth Amendment when they are imprisoned past their mandatory conditional release date, nor was it clearly established that an inmate has a liberty interest in mandatory conditional release protected by the Fourteenth Amendment's substantive due process clause.

Hurd nevertheless urges us to find that these rights were clearly established because they follow from existing precedent. For his Eighth Amendment claim, Hurd relies on *Sample*, 885 F.2d 1099, *Calhoun*, 999 F.2d 647, *Sudler v. City of New York*, 689 F.3d 159 (2d Cir. 2012), and *Francis*, 942 F.3d 126. These cases confirm a uniform legal principle that no federal, state, or local authority can keep an inmate detained past the expiration of the sentence imposed on them. But in the qualified immunity analysis, the Supreme Court has admonished that rights should not be

25

defined at a high level of generality and instead must be "particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks and citation omitted). None of the cases upon which Hurd relies addresses a conditional release scheme, let alone one in which an inmate is entitled to mandatory release prior to the expiration of their maximum sentence. More to the point, none of them confirm that prolonging an inmate's detention past their conditional release date might violate the inmate's rights under the Eighth Amendment.

*Sample* concerned Pennsylvania inmate Joseph Sample, who was granted bail pending a new trial after his life sentence was vacated on appeal. 885 F.2d at 1102. The senior records officer at a Pittsburgh detention facility was instructed to determine whether Sample could be released; the officer erroneously informed authorities that Sample still had time left on another sentence. *Id.* Sample served nine extra months in prison as a result. *Id.* at 1102–03.

Because of his authority and job responsibilities, the records officer's error rendered him liable under the Eighth Amendment. *Id.* at 1110–12. Specifically, the Third Circuit held that prolonged incarceration past the expiration of a prison sentence constitutes punishment under the Eighth Amendment. *Id.* at 1108.

26

Where there is no penological justification for that incarceration, as determined by the deliberate indifference prong, that punishment is cruel and unusual; and to be liable under § 1983, the officer's deliberate indifference must have caused the prolonged incarceration. *Id.* at 1108–11.

To be sure, *Sample* clearly established that "imprisonment beyond one's term constitutes punishment within the meaning of the eighth amendment." 885 F.2d at 1108. But it did not establish that the Eighth Amendment prohibits imprisonment beyond a mandatory conditional release date that occurs prior to the expiration of the maximum sentence.

*Calhoun* concerned New York inmate Bennie Calhoun, who was sentenced to a maximum term of six years, released on parole, arrested for a parole violation with two months left on the maximum term, and reincarcerated on a finding of probable cause for the parole violation. 999 F.2d at 650. The parole board declared Calhoun a "delinquent," meaning the time between his arrest and reincarceration —in this case, five days—was added to his maximum sentence. *Id.* at 650–51. New York law entitled Calhoun to a final parole revocation hearing to determine his guilt on the parole violation, but his amended maximum sentence expired before

this hearing could take place, and Calhoun was administratively discharged. *Id.* He sued based on this prolonged incarceration of five days. *Id.* at 651–52.

We focused on Calhoun's due process claim—that he was sentenced based on a parole violation charge, rather than any finding of guilt. *Id.* at 652–54. But in a single paragraph, we noted (again, as a descriptive matter) that five extra days in prison does not satisfy the constitutional harm prong of the Eighth Amendment analysis, and even if it did, Calhoun could not show any deliberate indifference and his Eighth Amendment claim failed. *Id.* at 654. We distinguished those five days from the nine months of prolonged detention in *Sample*—long enough to qualify as harm of a constitutional magnitude. *Id.* Thus, at most, *Calhoun* reinforced *Sample*'s holding that unlawful detention past the expiration of a maximum sentence constitutes punishment under the Eighth Amendment. Like *Sample*, *Calhoun* did not touch on conditional release.

*Sudler* concerned New York inmates who were sentenced to felony state prison terms, released on parole, convicted of misdemeanor parole violations, sentenced to concurrent sentences in City custody for those parole violations, and denied "parole jail-time credit" by prison officials upon their transfer back into state custody to complete their original sentence terms. 689 F.3d at 162–65. By

28

denying the inmates credit for the time served on their misdemeanor parole violations against their felony prison terms, the prison officials effectively imposed consecutive sentences and prolonged the terms of the inmates' sentences, without an order from the sentencing judges.

We held that the prison officials were entitled to qualified immunity because it was not clearly established that an inmate's procedural due process rights are violated when an administrator alters a sentence imposed by the court. *Id.* at 174–77. After introducing the inmates' due process theory, we noted in a footnote that "[w]e have suggested in the past, and other courts within and without this Circuit have held, that detention beyond that authorized by law may violate the Eighth Amendment." *Id.* at 169 n.11. In addition to *Sample*, we cited to *Calhoun* for support, describing the latter decision as "assuming that detention of a prisoner beyond the end of his term could violate the Eighth Amendment in appropriate circumstances, but finding no violation where the unauthorized detention lasted only five days and the plaintiff failed to demonstrate the defendants' deliberate indifference." *Id.* Because no party in *Sudler* raised the issue, however, any Eighth Amendment claim was waived. *Id.* Accordingly, *Sudler* only reinforces the principle established in *Sample* and acknowledged in *Calhoun* that the Eighth

Amendment protects against prolonged imprisonment that is not authorized by law. It too did not discuss conditional release or how conditional release relates to the expiration of a maximum term of imprisonment.

*Francis* concerned New York inmate Byran Francis, who was sentenced in state court to serve time concurrent with a federal sentence yet to be imposed, contrary to New York law. 942 F.3d at 131–35. The subsequently imposed federal sentence was not ordered to run concurrently with the previously imposed state sentence. *Id.* at 132. After Francis commenced his federal sentence, DOCCS officials realized the state court's error, determined of their own accord that Francis's sentences were consecutive, and requested the federal authorities transfer him back to state custody at the completion of his federal sentence, without seeking clarification or providing Francis an opportunity to be heard. *Id.* at 134–36. Upon release from federal custody into state custody, Francis sought resentencing in state court and was released four months later. *Id.* at 136–37.

We held that this violated the Francis's procedural due process rights. *Id.* at 141–45. The officials were entitled to qualified immunity, however, because the specific procedural protections to which we found Francis entitled were not clearly established before that decision. *Id.* at 148–49. By contrast, we declined to reach

the merits of Francis's Eighth Amendment claim in determining that the officials were entitled to qualified immunity for any constitutional violation. *Id.* at 149–51.

We acknowledged in *Francis* that "[n]o case establishes that these four months of additional incarceration, although of serious dimension, crossed the threshold of sufficient objective seriousness to constitute cruel and unusual punishment under the Eighth Amendment." *Id.* at 150 (internal quotation marks, alteration, and citation omitted). In doing so, we rejected the inmate's argument that *Haygood v. Younger*, 769 F.2d 1350, 1352–53, 1358 (9th Cir. 1985) (en banc)— where an inmate remained incarcerated for five years due to an erroneous interpretation of state law—and *Sample*, 885 F.2d 1099, clearly foreshadowed a constitutional determination.

Although these courts hinted at the outcome in this case, our legal conclusion was not manifest. Each case concerns detention beyond an inmate's maximum sentence. Before today, we have never held that an inmate suffers a constitutional harm under the Eighth Amendment when they are detained beyond a statutorily mandated release date, even if that mandatory release date precedes the expiration of the maximum term of their sentence. It was clearly established that New York State could not detain Hurd past the expiration of his maximum

31

sentence, but it was not clearly established that once Hurd's conditional release date was approved, continued detention beyond that date qualifies as a constitutional harm for Eighth Amendment purposes.

As for his substantive due process claim, Hurd admits that no decision has held that imprisonment past a mandatory conditional release date violates the Fourteenth Amendment's substantive protections. He nevertheless argues that "such a conclusion follows inescapably from the procedural due process cases, as a prisoner must have such a right once state officials have actually granted him discretionary early release." Appellant Br. 39.

We disagree. The substantive due process analysis differs from procedural due process; and it is not the case that one must follow from the other. And for the same reasons that our precedents do not dictate the outcome of his Eighth Amendment claim, Hurd's liberty interest in conditional release does not obviously follow from the procedural due process cases upon which Hurd relies.

Fredenburgh is therefore entitled to qualified immunity on Hurd's Eighth and Fourteenth Amendment claims.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.

32