UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
August Term, 2021
(Argued: October 14, 2021     Decided: June 17, 2022
Amended:  October 28, 2022)
Docket No. 19-3575

_____

RAFIQ SABIR, JAMES J. CONYERS,
*Plaintiffs-Appellees*,

v.

D.K. WILLIAMS, IN HER INDIVIDUAL CAPACITY AND OFFICIAL CAPACITY AS
WARDEN OF FCI DANBURY, HERMAN QUAY, IN HIS INDIVIDUAL CAPACITY,
*Defendants-Appellants*;


MARK S. INCH, DIRECTOR OF FEDERAL BUREAU OF PRISONS, THOMAS R. KANE,
DIRECTOR OF FEDERAL BUREAU OF PRISONS, HUGH J. HURWITZ, IN HIS
INDIVIDUAL CAPACITY AS DIRECTOR OF THE FEDERAL BUREAU OF PRISONS,
*Defendants*.


_____

Before:      WALKER, SACK, AND CARNEY, *Circuit Judges*.

Defendants-appellants D.K. Williams and Herman Quay appeal from an order denying their motion to dismiss in part and rejecting their qualified immunity defense against the Religious Freedom Restoration Act ("RFRA") claims of plaintiffs-appellees Rafiq Sabir and James Conyers.  The plaintiffs-appellees are practicing Muslims whose religion requires them to perform daily congregational prayers with as many other Muslims as are available.  According to the allegations in their complaint, while Sabir and Conyers were incarcerated at the Federal Correctional Institution in Danbury, Connecticut, the defendants-appellants enforced a policy that restricted group prayer to the prison's chapel, despite that facility's frequent unavailability.  As a result, Sabir and Conyers were forced to forgo their religious exercise of group prayer to avoid disciplinary action.  We conclude that the wardens are not

entitled to qualified immunity at this stage of the proceedings because the pleadings do not establish that their enforcement of the policy against Sabir and Conyers was in service of a compelling interest, and it was clearly established at the time of the violation that substantially burdening an inmate's religious exercise without justification violates RFRA. We therefore

AFFIRM the order of the district court.

> DANIEL WINIK, (Brian M. Boynton, Leonard C. Boyle, Michael S. Raab, *on the brief*), U.S. Department of Justice, Washington, D.C., *for Defendant-Appellants*;
>
> MATTHEW W. CALLAHAN, Muslim Advocates, Washington, D.C., *for Plaintiffs-Appellees*;
>
> Elizabeth A. Bixby, Daniel M. Greenfield, *on the brief*, Roderick & Solange MacArthur Justice Center, Washington, D.C. and Chicago, IL, *for Amicus Curiae, Roderick & Solange MacArthur Justice Center*.

SACK, *Circuit Judge*:

The plaintiffs, Rafiq Sabir and James Conyers, are practicing Muslims who believe that they are required under the precepts of their religion to perform five daily congregational prayers with as many other Muslims as are available and wish to participate. Sabir and Conyers allege that while they were incarcerated at the Federal Correctional Institution in Danbury, Connecticut

("FCI Danbury"), Warden D.K. Williams and Warden Herman Quay enforced a policy that restricted prayer in groups of more than two to the prison's chapel, despite that facility's frequently unavailability. As a result, the plaintiffs were forced to forgo their engagement in a required religious practice to avoid disciplinary action.

The plaintiffs filed this suit against defendant prison officials in the United States District Court for the District of Connecticut, seeking injunctive relief and damages on the grounds that FCI Danbury's communal prayer policy violated the Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause of the First Amendment to the United States Constitution. In August 2019, the district court (Bolden, *J.*) granted the defendants' motion to dismiss the plaintiffs' Second Amended Complaint in large part, but declined to dismiss the plaintiffs' RFRA claims for damages against the defendants in their individual capacities, holding that qualified immunity was not available to Williams and Quay at the motion-to-dismiss stage.

We agree with the district court that the defendants-appellants are not entitled to qualified immunity at this stage of the proceedings because the allegations in the complaint and the documents attached to it as exhibits do not

establish that their enforcement of the policy against Sabir and Conyers was in service of a compelling interest, and it was clearly established at the time of the violation that substantially burdening an inmate's religious exercise without justification violates RFRA.

## BACKGROUND

*Factual Background*

For the purposes of this appeal from the district court's denial of a motion to dismiss, we are required "to accept as true those factual assertions set forth in plaintiff[s'] complaint." *Charles W. v. Maul*, 214 F.3d 350, 356 (2d Cir. 2000). In reviewing a motion to dismiss, we "may consider [not only] the facts alleged in the complaint, [but also] documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). According to the complaint as thus augmented:

Plaintiffs Rafiq Sabir and James Conyers were inmates at FCI Danbury, a low-security federal prison, beginning in July 2014 and September 2016, respectively. Defendant Herman Quay was the Warden of FCI Danbury from July 2014 to December 2015; Defendant D.K. Williams was the Warden of

FCI Danbury at the time of the plaintiffs' Second Amended Complaint, dated June 1, 2018 (the "SAC"), which was the operative pleading at the time of the defendants' motion to dismiss.

Individuals incarcerated at FCI Danbury have a relatively high degree of autonomy: Many living quarters remain unlocked, and inmates regularly gather, with prison approval, in large groups for activities ranging from inmate-led fitness classes to sports and card games. FCI Danbury has several recreational facilities, including "a recreation yard, weight room, gymnasium, bathroom, wellness room, hobbycraft [sic] room, music room, video viewing area with game tables, the chapel facility, and several offices." SAC at 8, ¶ 29. The inmates also have access to "the medical area, food services, education and housing facilities, laundry, the barber shop, and the prison work program area." *Id.*

Sabir and Conyers are practicing Muslims. A central aspect of their religious exercise is a prayer known as a "salah," which, according to the religion's tenets, adult Muslims are required to perform five times each day. The plaintiffs possess the "sincerely-held religious belief that if two or more Muslims are together at a time of required prayer, they must pray together behind one

prayer leader" and cannot "break up into smaller groups." *Id.* at 6, ¶ 23. They

explain that performing group prayer with the largest possible number of other

Muslims "multiplies the blessings and utility of prayer." *Id.* at 5-6, ¶ 19.

The Federal Bureau of Prisons ("FBOP") does not have a formal

policy categorically banning congregational prayer within its facilities. Each

facility's warden is, however, authorized to temporarily restrict a specific

religious practice if he or she determines that the "practice jeopardizes the

facility's safety and security." *Id.* at 6-7, ¶ 24. At many FBOP facilities—

including those in which both Sabir and Conyers were previously housed—

prison officials allowed congregational prayer without significant restrictions.

In March 2014, FCI Danbury's then-warden, Maureen Baird,

nonetheless instituted a policy restricting prayer in groups of more than two

people to the prison's chapel. The policy statement provided:

> Congregate Prayer, outside of the Chapel, for all faith
> groups will follow the following guidelines:
>
> a) Must get the approval of the location to pray from
> work supervisor, program supervisor, etc.
> b) Prayer individually or in pairs is permitted, however,
> group prayer of 3 or more is restricted to the Chapel.
> c) Prayers can be made at work detail sites, school, or
> units during break times.

> d) Prayer rug or clean towel is permitted to cover the
> floor.
> e) In case of institutional emergency or instructed by
> staff prayers will be terminated.

*Id.* at 8-9, ¶ 30 (alterations omitted). Although FCI Danbury permitted congregational prayer in the chapel, groups seeking to use the space could only do so when chapel staff was present and the rooms were not otherwise occupied or reserved. The facility was "frequently unavailable" during the plaintiffs' prayer times. *Id.* at 9, ¶ 32.

In October 2014, Sabir was praying with two other inmates in the auditorium when corrections officers approached to inform them that group prayer was only permitted in the chapel and that violating the rule could result in discipline. Sabir and the others explained to the officers that their religion required them to perform congregational prayer five times per day and that the chapel was frequently unavailable during those times. The officers responded by reiterating the terms of the prison's group prayer policy. As a result of this incident, Sabir was "fearful" that he would be sanctioned or disciplined for engaging in group prayer. *Id.* at 11, ¶ 41. Prison officials also repeatedly informed Conyers that congregational prayer outside of the chapel was not allowed. He therefore felt compelled to refrain from engaging in group prayer to

7

avoid disciplinary action. The plaintiffs allege that the wardens' "enforcement of the Policy prevent[ed] [them] from . . . engaging in daily congregational prayer as mandated by [their] sincerely-held religious beliefs." *Id.* at 11, ¶¶ 41-42. Sabir and Conyers have thus "been forced to choose between acting in accordance with their sincere religious beliefs and facing discipline at the prison, including possible solitary confinement and loss of other privileges." *Id.* at 11, ¶ 44. According to the SAC, "Defendants have offered no meaningful justification for the [p]olicy" restricting group prayer. *Id.* at 9, ¶ 33.

Each plaintiff submitted an administrative grievance asserting that the policy violated his right to freely exercise his religion. Warden Quay denied Sabir's grievance in January 2015 but offered no explanation beyond reiterating the content of the policy, stating that "congregate prayer is not restricted" because praying in pairs was allowed and "congregate prayer is permitted in the Chapel." Response of H. Quay to Sabir (Jan. 27, 2015), J.A. 48. Quay's determination was subsequently upheld by FBOP's Regional Director, who wrote that FCI Danbury's congregate prayer policy was "a reasonable, least restrictive alternative of accommodating prayer by groups of three or more inmates in the chapel when the schedule permits." Response of J.L. Norwood to Sabir (Mar. 11,

2015), J.A. 51. FBOP's Administrator of National Inmate Appeals later agreed, reiterating the terms of the policy, and stating that it provided "a reasonable and equitable opportunity to pursue your religious beliefs and practices." Response of Ian Connors to Sabir (Sept. 27, 2016), J.A. 53.

In May 2017, Warden Williams denied Conyers's grievance, restating the policy and explaining that that the prison's Religious Services Department had consulted with Muslim Imams and determined that Muslims were not required to perform their five daily prayers in groups of three or more. *See* Response of D.K. Williams to Conyers (May 19, 2017), J.A. 56. Williams's determination was upheld by FBOP's Regional Director, who found that "the institution's policy on prayer does not ban group prayer." Response of M.D. Carvajal to Conyers (July 5, 2017), J.A. 58. Instead, the Regional Director explained that "the policy provides the necessary structure to promote equity among all faith groups in regards to prayers in the chapel area" and that "[t]his allowance offers you a least restrictive alternative when congregational prayer cannot be accommodated." *Id.* The Administrator of National Inmate Appeals concurred, adding that the policy was "the least restrictive alternative in order to afford inmates with more opportunities to practice this religious observance

9

consistent with security and budgetary constraints." Response of Ian Connors to Conyers (Oct. 24, 2017), J.A. 61.

After the initiation of this proceeding, Sabir and Conyers were each transferred to another institution.

*Procedural History*

In May 2017, Sabir, acting pro se, initiated this suit against Williams and the director of the FBOP, alleging violations of the Free Exercise Clause of the First Amendment, the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, et seq. ("RFRA"), and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et seq. ("RLUIPA"). The district court dismissed Sabir's suit for failure to pay a filing fee, then reopened the case and dismissed it under the screening provision of the Prison Litigation Reform Act, 28 U.S.C. § 1915A.

In December 2017, the district court granted Sabir's motion to reopen the case and amend his complaint. The court dismissed Sabir's RLUIPA claim because that statute applies only to state and local governments, but it allowed his RFRA and Free Exercise claims to proceed.

Sabir then filed the SAC, through newly obtained counsel, in June 2018. The SAC added Conyers as an additional plaintiff and named Quay as an

additional defendant. Sabir and Conyers asserted that FCI Danbury's communal prayer policy violated RFRA and the Free Exercise Clause. They sought a declaration that the policy was unlawful, injunctive relief preventing the enforcement of the policy, and damages from Williams and Quay in their individual capacities. The defendants moved to dismiss the claims for damages against Williams and Quay, and later moved to dismiss the equitable claims as moot in light of Sabir's and Conyers's respective transfers out of FCI Danbury.

The district court granted in part and denied in part the defendants' motion to dismiss. *See Sabir v. Williams*, No. 3:17-cv-749 (VAB), 2019 WL 4038331 (D. Conn. Aug. 27, 2019). It declined to dismiss the plaintiffs' RFRA claims for damages against the defendants acting in their individual capacities, concluding that the group prayer policy was "arguably a substantial burden on the exercise of religion." *Id.* at *9.[1] The plaintiffs stated a claim by "detail[ing] the religious importance of congregational prayer," showing "the burden the Policy has placed

---

[1] On appeal, we consider only the plaintiffs' claim for individual-capacity damages under RFRA, not under the First Amendment. Before the district court, the defendants argued that a *Bivens* claim "is the only avenue for damages under the First Amendment" and claimed that the "[p]laintiffs s[ought] to impermissibly expand *Bivens* to include a new context . . . ." *Sabir*, 2019 WL 4038331, at *7-8. In response, the plaintiffs conceded that "they only seek money damages against the wardens in their individual capacity based on the Religious Freedom Restoration Act[;] therefore Plaintiffs need not, and do not, look to *Bivens* to seek damages." *Id.* at *8 (internal quotation marks omitted).

on [the plaintiffs'] exercise of religion," and "alleg[ing] that FCI Danbury only applies this sort of burden to religious activities, while other group activities continued unencumbered." *Id.*

The district court held that qualified immunity was not available to Williams or Quay at the motion-to-dismiss stage. The court explained that the policy "may violate clearly established First Amendment case law and the RFRA statute," and, therefore, decided that "it is plausible—at this stage—that qualified immunity would not shield Defendants from liability in their individual capacities." *Id.* at *10-11. The court found it "[s]ignificant[]" that in *Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) ("*Salahuddin*"), the Second Circuit denied qualified immunity to prison officials for religious liberties claims, even at the later stage of summary judgment proceedings, "because it was clearly established . . . that prison officials may not substantially burden inmates' right to religious exercise without some justification . . . ." *Sabir*, 2019 WL 4038331, at *11 n.3 (quoting *Salahuddin*, 467 F.3d at 275-76).

The district court dismissed most of the plaintiffs' equitable claims as moot in light of Sabir's and Conyers's transfers. *See id.* at *5 ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and

12

injunctive relief against officials of that facility." (quoting *Salahuddin*, 467 F.3d at

272)).  The only surviving claim for equitable relief was Sabir's claim against

FBOP's Director, *see id.* at *6, but in May 2020, Sabir voluntarily dismissed it.[2]

## DISCUSSION

On appeal, the wardens assert that the district court erred in

denying their motion to dismiss the plaintiffs' individual-capacity damages

claims because the wardens are entitled to qualified immunity, even at this early

stage of the proceedings.  We disagree.  They cannot point to assertions in the

SAC or evidence in its attachments that demonstrate that their enforcement of

the policy against Sabir and Conyers was in service of a governmental interest.

Because it was clearly established at the time that substantially burdening

prisoners' religious exercise without justification violates RFRA, the wardens are

not entitled to qualified immunity.

### I.      Standard of Review

"We review a district court's denial of qualified immunity on a

---

[2] We have jurisdiction to consider this appeal of the court's partial denial of the defendants' motion to dismiss under 28 U.S.C. § 1291 through the collateral order doctrine.  *See Locurto v. Safir*, 264 F.3d 154, 162 (2d Cir. 2001) ("A denial by a district court of a claim of qualified immunity—to the extent that it turns on an issue of law—is a collateral order subject to immediate appeal.").

motion to dismiss de novo, accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in plaintiffs' favor." *Garcia v. Does*, 779 F.3d 84, 91 (2d Cir. 2015) (internal quotation marks omitted).

## II.    Qualified Immunity

A.    Legal Analysis

We apply a two-step analysis to determine whether qualified immunity bars a plaintiff's claim against government officials for civil damages related to actions taken in the course of their official duties. *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019). "Pursuant to that analysis, '[q]ualified immunity shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Id.* (alterations in original) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)). When qualified immunity shields defendants from liability, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223,

236 (2009); *see also Francis*, 942 F.3d at 140.[3]  However, because we conclude that

the district court properly denied qualified immunity to the defendants at the

pleadings stage, we must engage in both prongs of the analysis.  First, we decide

that the plaintiffs have adequately pled a violation of RFRA, and second, we

---

[3] Before *Pearson*, courts were required to complete both steps in every case, because "skip[ping] ahead" to the second step without first holding that an official violated a plaintiff's rights might preclude "the law's elaboration from case to case."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The Supreme Court has continued to recognize this well-founded concern, even after *Pearson* introduced discretion as to the order in which courts may address the prongs.  *See Camreta v. Greene*, 563 U.S. 692, 704-06 (2011) (recognizing "that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo" and explaining that merits rulings in immunity-barred cases are "self-consciously designed . . . with this Court's permission" to "establish[] controlling law and prevent[] invocations of immunity in later cases").  *Camreta* warned of a "repetitive cycle" in which a court repeatedly declines to address the merits because immunity exists, and the official continues to engage in the challenged practice because he will remain immune until the right is clearly established.  *Id.* at 706 & n.5.  This cycle could happen "again, and again, and again," *id.* at 706, thereby allowing "palpably unreasonable conduct [to] go unpunished," *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, *J.*, dissenting).

   Although this "repetitive cycle of qualified immunity defenses" could be broken if the same merits questions "arise in a case in which qualified immunity is unavailable," the Court has warned that "some kinds of constitutional questions do not often come up in these alternative settings."  *Camreta*, 563 U.S. at 706 n.5 (citing *Pearson*, 555 U.S. at 236 and *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).  Claims brought by incarcerated individuals against officials at a specific institution likely fall into that category.  As evidenced by the case at bar, a prisoner's equitable claims could be mooted at any moment by his transfer to a new facility.  *See Salahuddin*, 467 F.3d at 272.  Thus, these circumstances present a higher likelihood that prisoners' rights do not become clearly established.  Even if it were not clearly established that the wardens violated RFRA, we would therefore still address the merits question first to clearly establish the law and prevent a vicious cycle of shielded misconduct.

conclude that their rights were clearly established at the time of the alleged violations.

B.     Violation of RFRA

In the first step of the qualified immunity inquiry, we must determine whether the SAC plausibly alleges that the wardens' enforcement of the group-prayer policy against Sabir and Conyers violated RFRA.  We conclude that it does.

RFRA prohibits the government from "substantially burden[ing] a person's exercise of religion" unless "application of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a)-(b).  To establish a prima facie RFRA violation, the plaintiffs must demonstrate that they sought to engage in the exercise of religion and that the defendant-officials substantially burdened that exercise.  The government then faces an "exceptionally demanding" burden to show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties . . . ."  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014).

First, Sabir and Conyers's performance of congregational prayer is undoubtedly religious exercise. The term "exercise of religion" extends beyond "belief and profession" and encompasses "the performance of . . . physical acts [such as] assembling with others for a worship service." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005). "It is *well established* that prisoners have a constitutional right to participate in congregate religious services," *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (emphasis added), and that same religious exercise is also protected by RFRA, which Congress intended to cover an even broader range of activity than the First Amendment does, *see Hobby Lobby Stores, Inc.*, 573 U.S. at 696.[4]

Second, the wardens' application of the group-prayer policy against Sabir and Conyers substantially burdened that religious exercise. An incarcerated plaintiff "easily satisfie[s]" his burden of proving that a prison policy

---

[4] Williams's purported reliance on the advice of imams to determine that Muslims do not need to perform the five daily prayers in groups does not change this analysis. RFRA's definition of the "exercise of religion" broadly includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Hobby Lobby Stores, Inc.*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000cc-5(7)(A)). The "proper inquiry" is whether Sabir's and Conyers' beliefs were "sincerely held and in [their] own scheme of things, religious," which the SAC adequately alleges. *Ford v. McGinnis*, 352 F.3d 582, 598 (2d Cir. 2003) (emphasis and internal quotation marks omitted); *see id.* ("[R]eligious authorities' opinions that a particular practice is not religiously mandated under Muslim law, without more, cannot render defendants' conduct reasonable.").

substantially burdens his religious exercise when the policy "puts [him] to th[e] choice" between "engag[ing] in conduct that seriously violates [his] religious beliefs" or risking "serious disciplinary action" for adhering to those beliefs. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (internal quotation marks omitted).[5] Sabir stopped engaging in congregate prayer because he was "fearful" of being disciplined after officers chastised his prayer group and threatened "that violation of th[e] rule may result in disciplinary action." SAC at 10-11, ¶¶ 37-38; 41. Officials repeatedly warned Conyers that congregational prayer outside of the chapel was not allowed, and "[r]ather than risk discipline for engaging in congregational prayer . . . [he] refrained from engaging in congregational prayer on many occasions." *Id.* at 11, ¶ 43. Both plaintiffs "have been forced to choose between acting in accordance with their sincere religious beliefs and facing discipline at the prison, including possible solitary confinement and loss of other privileges." *Id.*, ¶ 44. "Because the [group prayer] policy puts [the plaintiffs] to this choice, it substantially burdens [their] religious exercise." *Holt*, 574 U.S. at

---

[5] *Holt* involved a challenge under RLUIPA to restrictions on religious exercise and is relevant here because the statutory provision in that case "mirrors RFRA and . . . thus allows prisoners to seek religious accommodations pursuant to the same standard as set forth in RFRA." *Holt*, 574 U.S. at 357-58 (internal quotation marks omitted).

361. Moreover, "the availability of alternative means of practicing religion"—such as praying in pairs—is insufficient to eliminate that substantial burden. *Id.*

Third, once plaintiffs have demonstrated that defendants substantially burdened their religious exercise, the defendants must establish that the "application of the burden to the [plaintiffs]" is the "least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b). RFRA thus places an "exceptionally demanding" burden on the wardens to show that they "lack[ed] other means of achieving [their] desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby Stores, Inc.*, 573 U.S. at 728. And because RFRA expressly requires government officials to demonstrate a compelling interest, it follows that prison officials *necessarily* violate RFRA when they substantially burden a plaintiff's exercise of religion without demonstrating that they had *any* interest, compelling or otherwise, in doing so. *See Salahuddin*, 467 F.3d at 275-76 ("[P]rison officials may not substantially burden inmates' right to religious exercise without some justification . . . ."). The wardens chose to press this appeal at the motion-to-dismiss stage; therefore, our consideration is limited to any interests and evidence of narrow tailoring contained in the allegations of the complaint or, as

relevant here, any facts reflected in the attachments to it. *See Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020). From these documents, we can discern no asserted governmental interest—much less a compelling one—for the requirement that Sabir and Conyers engage in group prayer only in the prison chapel.

Quay's and Williams's denials of the plaintiffs' administrative grievances were attached to the complaint and may therefore be considered in reviewing their motion to dismiss, but they are ultimately unhelpful to their position. In denying Sabir's grievance, Quay declared that "congregate prayer is not restricted" despite recognizing that "group prayer of 3 or more is restricted to the Chapel." Response of H. Quay to Sabir (Jan. 27, 2015), J.A. 48. His confusing paraphrase of the policy does nothing to demonstrate that a compelling interest is at stake, or that the policy is the least restrictive means of furthering any such interest. In denying Conyers's grievance, Williams also restated the policy and suggested that the prison had determined through consultations with religious leaders that performing congregate prayer five times per day was not necessary. At most, Williams's defense of the policy could suggest that Conyers's religious beliefs were not widely held, but the administrative denial again fails to offer any

20

governmental interest for the policy's enforcement against Conyers or explain how this enforcement was narrowly tailored to serve any such interest.

The wardens contend that other attachments to the complaint adequately reflect the governmental interests served by their enforcement of the policy against Sabir and Conyers. Specifically, they point to subsequent statements by high-ranking FBOP officials upholding the wardens' denials. One response from FBOP's Regional Director offers the conclusory statement that FCI Danbury's policy was "a reasonable, least restrictive alternative of accommodating prayer" consistent with "the orderly running of the institution" and with "staff supervision" and "space" constraints. Response of J.L. Norwood to Sabir (Mar. 11, 2015), J.A. 51. Another response by FBOP's Administrator of National Inmate Appeals similarly declares that the policy was "the least restrictive alternative" that would allow for group prayer "consistent with security and budgetary constraints." Response of Ian Connors to Conyers (Oct. 24, 2017), J.A. 61.

Even taking into account these subsequent attempts by non-defendant FBOP officials to justify the policy's existence more broadly, we cannot identify any governmental interests on which Quay and Williams relied when

they enforced the policy against Sabir and Conyers. "[P]rison officials must have been pursuing the interest . . . when limiting [the plaintiffs'] religious exercise," and we have explained that this requirement "ensures that *prison officials actually had*, not just could have had, a legitimate reason for burdening protected activity." *Salahuddin*, 467 F.3d at 277 (emphasis added). Subsequent statements from regional and national supervisory officials shed no light on the *wardens'* actual reasons for enforcing the policy against Sabir and Conyers. For the same reason, a panel of this Court similarly refused to "impute[] the penological interest articulated by [one official] onto [another]." *Barnes v. Fedele*, 813 F. App'x 696, 701 (2d Cir.) (summary order), *cert. denied*, 141 S. Ct. 884 (2020). Here, "nothing in the record sets forth [the wardens'] motivation or thinking," and "[i]t is possible, after all, that [the FBOP officials'] 'understanding' of the policy . . . was not aligned with" that of the wardens. *Id.* The wardens cannot "point[] to anything in the [complaint or the evidence in the attachments] to show that *they* relied on" compelling interests, and we cannot "manufacture facts out of thin air." *Salahuddin*, 467 F.3d at 275 (emphasis added); *see Barnes v. Furman*, 629 F. App'x 52, 57 (2015) (summary order) ("[B]ecause defendants have not identified any penological interests supporting the policy, we cannot assess the reasonableness

22

of their actions.").

Even if we could impute the FBOP officials' reasoning to the wardens, it would not suffice. Under RFRA, it is not enough to offer "very broad terms"; rather, RFRA demands "a more focused inquiry" that "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to . . . the particular claimant whose sincere exercise of religion is being substantially burdened." *Hobby Lobby Stores, Inc.*, 573 U.S. at 726 (internal quotation marks omitted). "This requires us to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants . . . .'" *Id.* at 726-27 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)). The FBOP officials' statements do not explain how the wardens' enforcement of this policy *against Sabir and Conyers* served an interest in "the orderly running of the institution," or "security and budgetary constraints." Responses of J.L. Norwood and Ian Connors, *supra* at J.A. 51, 61. They offer only "broadly formulated interests," which are insufficient to satisfy RFRA.[6] *Hobby*

---

[6] This not to say that the plaintiffs would necessarily fail to state a claim under RFRA if the wardens, in their responses to the plaintiffs' grievances, had identified a sufficiently specific interest furthered by the policy. So long as the plaintiffs plausibly allege that

*Lobby Stores, Inc.*, 573 U.S. at 726.

Further, FBOP officials offered only conclusory assertions that the policy was the "least restrictive alternative," Responses of J.L. Norwood and Ian Connors, *supra* at J.A. 51, 61, and even if these claims were attributable to the wardens, we could not credit them in our review since the plaintiffs plausibly allege that the policy is more restrictive than necessary. *See Williams v. Annucci*, 895 F.3d 180, 192 (2d Cir. 2018) ("Taking the [government] at its word under such circumstances would involve 'a degree of deference that is tantamount to unquestioning acceptance.'" (quoting *Holt*, 574 U.S. at 364)). Indeed, it seems highly unlikely that the policy is narrowly tailored considering the fact that, according to the SAC, comparable secular activities—including inmate-led fitness classes and card games—do not face similar restrictions. *See Williams*, 895 F.3d at 193 ("[U]nexplained disparate treatment of 'analogous nonreligious conduct' leads us to suspect that a narrower policy that burdens [the plaintiffs] to a lesser degree is in fact possible."); *Hobby Lobby Stores, Inc.*, 573 U.S. at 730 (noting that the government "itself has demonstrated that it has at its disposal an

---

any purported interests are pretextual—as they have done here by asserting that there is no meaningful justification for the policy and pointing to comparable secular activities that are not restricted—the legitimacy of the officials' justification for the policy would be an issue of fact incapable of resolution at the motion-to-dismiss stage.

approach that is less restrictive" because it "has already established an accommodation" for others).[7]

Based on the pleadings and other material available to us on review, we thus conclude that Sabir and Conyers have plausibly alleged that the wardens' enforcement of the group-prayer policy against them violated RFRA.

## C.    Whether the Right was "Clearly Established"

Having determined that the plaintiffs pled a RFRA violation, we must address the second prong of the qualified immunity analysis: whether "the right [at issue] was clearly established at the time of the challenged conduct." *Francis*, 942 F.3d at 139 (internal quotation marks omitted).  We conclude that the plaintiffs' rights under RFRA were clearly established at the time of the alleged violations.

### 1. Legal Standard

Although the scope of qualified immunity is considered broad enough to protect "all but the plainly incompetent or those who knowingly violate the law," it is not available when an officer's actions are not objectively

---

[7] This "underinclusiveness" also counsels against a finding that the policy serves a compelling governmental interest.  *Williams*, 895 F.3d at 189; *see also id.* at 191 ("Such unexplained disparate treatment of 'analogous nonreligious conduct' leads us to question whether the [government's] interest . . . is as compelling as it suggests . . . .").

reasonable in light of clearly established law. *Ziglar v. Abbasi*, 137 S. Ct. 1843,

1867 (2017) (internal quotation marks omitted). "To determine whether the

relevant law was clearly established, we consider the specificity with which a

right is defined, the existence of Supreme Court or Court of Appeals case law on

the subject, and the understanding of a reasonable officer in light of preexisting

law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). Precedent "directly on

point" is not required for law to be clearly established, *District of Columbia v.*

*Wesby*, 138 S. Ct. 577, 590 (2018), and "[i]t is not necessary, of course, that the very

action in question has previously been held unlawful," *Abbasi*, 137 S. Ct. at 1866

(internal quotation marks omitted). Thus, "the absence of a decision by this

Court or the Supreme Court directly addressing the right at issue will not

preclude a finding that the law was clearly established so long as preexisting law

clearly foreshadows a particular ruling on the issue." *Garcia v. Does*, 779 F.3d 84,

92 (2d Cir. 2015) (internal quotation marks and brackets omitted).

### 2. *Qualified Immunity at the Pleadings Stage*

The Supreme Court has "repeatedly . . . stressed the importance of

resolving immunity questions at the earliest possible stage in litigation." *Hunter*

*v. Bryant*, 502 U.S. 224, 227 (1991). "But there is an obvious, if rarely expressed,

corollary to that principle: The immunity question cannot be resolved *before* the earliest possible stage, i.e., prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised." *Chamberlain*, 960 F.3d at 110 (internal quotation marks and citation omitted).

The wardens chose to press their qualified immunity defense at the pleadings stage, and they therefore must face the "more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Specifically, "the facts supporting the defense [must] appear on the face of the complaint," *id.*, or in its attachments and documents incorporated by reference, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).[8] On a motion to dismiss, the plaintiffs are "entitled to all reasonable inferences from the facts alleged, not only those that support [their] claim, but also those that defeat the immunity defense." *McKenna*, 386 F.3d at 436.

For this reason, we have explained that "advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch." *Chamberlain*, 960 F.3d at 111. Although it is possible for a qualified

---

[8] A previous version of this opinion referred to a since-overruled pleading standard. The reference has been deleted. We conclude that nothing further is required to correct the error.

immunity defense to succeed on a motion to dismiss, *see Liberian Cmty. Ass'n of Connecticut v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020), such a defense "faces a formidable hurdle . . . and is usually not successful," *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006) (internal quotation marks omitted); *see also Chamberlain*, 960 F.3d at 110 ("[A]s a general rule, the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion." (internal quotation marks omitted)).

### 3. Application

A reasonable officer should have known, based on clearly established law, that denying a Muslim inmate the ability to engage in group prayer without any justification or compelling interest, as alleged in the SAC, violates RFRA.

In 2006, we held in *Salahuddin* that it was clearly established that prison officials cannot substantially burden inmates' religious exercise without offering any justification. 467 F.3d at 275-76. There, we concluded that prison officials violated inmates' religious freedom under both RLUIPA and the First Amendment by requiring Sunni Muslims and Shi'ite Muslims to pray and fast jointly for Ramadan. *See id*. at 270, 275. Defendants had "not pointed to anything

28

in the record to show that they relied on legitimate penological justifications" and "our review of the record [did not] reveal any such evidence." *Id.* at 275. "Without some support in the record, we [could not] find that [prison] officials were worried that separate services would endanger inmates, or were short on space for separate services, or had some other reason for mandating the joint services." *Id.* "Although the facts at trial might [have] show[n] otherwise," even at the summary judgment stage in *Salahuddin*, the lack of evidence of the policy's justification "establish[ed] that [the plaintiff's] free-exercise rights were substantially burdened by a joint-worship policy not justified by . . . [a] compelling governmental interest . . . ." *Id.*

In addition to showing that violations of the plaintiff's constitutional and statutory rights had occurred, the lack of justification for the policy's enforcement in the record made clear that "[q]ualified immunity [was] not appropriate" even at the summary judgment stage "because it was clearly established at the time of the alleged violations that prison officials may not substantially burden inmates' right to religious exercise without some justification." *Id.* at 275-76. "[W]e [could not] say as a matter of law that it was objectively reasonable for any defendant to believe that the facts as they [stood]

29

on summary judgment showed no violation of a clearly established right." *Id*. at 276.

In the case at bar, we are at an even earlier stage of litigation than we were in *Salahuddin*. We are limited here to the allegations in the complaint and the evidence in the attachments to it. The wardens cannot point to any justification in that material for their imposition of a substantial burden on Sabir's and Conyers's religious exercise.[9] To repeat yet again, as in *Salahuddin*, "although the facts at trial" or summary judgment "might show otherwise," we cannot "manufacture [such] facts out of thin air." *Id.* at 275. Because it was clearly established at the time of the alleged violations of Sabir and Conyers's RFRA rights that the wardens could "not substantially burden inmates' right to religious exercise without some justification," "[q]ualified immunity is not appropriate at this stage" of the proceedings. *Id.* at 275-76.[10]

---

[9] Nor can the officials seriously dispute that it was clearly established that preventing a prisoner from engaging in congregational prayer constitutes a substantial burden on the prisoner's religious exercise. As we explained above, we have consistently recognized that policies restricting access to group prayer impose a burden on prisoners' free exercise rights. *See Salahuddin v. Coughlin*, 993 F.2d at 308; *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989).

[10] Our decision should not, of course, be read to suggest that the district court should automatically grant summary judgment to defendants on qualified immunity grounds upon the introduction of any evidence that their enforcement of the policy served a

We reject the wardens' argument that *Salahuddin*'s holding is an "abstract legal principle" that "cannot establish law for purposes of qualified immunity." Appellants' Br. at 17. There are, of course, some contexts in which a higher degree of specificity is required to establish the law for purposes of qualified immunity than in others. For example, the Fourth Amendment's prohibition of "unreasonable searches and seizures" is an "abstract right[]" because "it may be difficult for an officer to know whether a search or seizure will be deemed reasonable given the precise situation encountered." *Abbasi*, 137 S. Ct. at 1866; *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) ("Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." (internal quotation marks and alteration omitted)). No such concerns

---

compelling interest. On a motion for summary judgment, any "unchallenged and unresolved factual allegations" will be "viewed in the light most favorable to" Sabir and Conyers. *Salahuddin*, 467 F.3d at 275. It may be that the qualified immunity issue can only be resolved at trial if, for instance, it appears that a justification offered by the defendants may be pretextual. *Id.* at 277 (holding that officials must prove they were "pursuing the interest . . . when limiting [the plaintiff's] religious exercise," so as to "ensure[] that prison officials actually had, not just could have had, a legitimate reason for burdening protected activity"). For example, a purported interest in security may be pretextual if comparable secular activities posing identical security concerns are not restricted. *See Williams*, 895 F.3d at 191-92.

are present here.  Based on RFRA's requirements, it is not "difficult for an [official] to know whether" an unjustified substantial burden on religious exercise "will be deemed reasonable." *Abbasi*, 137 S. Ct. at 1866.  As the text of the statute itself explains: "Government may substantially burden a person's exercise of religion *only if it demonstrates* that application of the burden to the person . . . is *in furtherance* of a compelling governmental interest . . . ."  42 U.S.C. § 2000bb-1 (emphasis added); *see also Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433-34 (2d Cir. 2009) (noting that courts "may examine statutory or administrative provisions in conjunction with prevailing circuit or Supreme Court law to determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights.").  Put another way, if an official substantially burdens a sincere religious exercise but cannot point to evidence that the application of the burden was in service of any interest—let alone a compelling one—the official has violated RFRA.

Thus, the wardens are not entitled to dismissal of the SAC on the basis of qualified immunity because our case law, in conjunction with the text of RFRA, clearly established at the time of the events at issue that substantially burdening Sabir's and Conyers's religious exercise with no justification, as was

32

alleged by the plaintiffs, violated RFRA.

## CONCLUSION

We have considered the parties' remaining arguments on appeal and conclude that they are without merit. For the reasons set forth above, we affirm the district court's order.